## CHARLESTON.

SANDUSKY *v.* FARIS *et al.*

Decided March 16, 1901.

1. INJUNCTION—*Bill—Answer—Exceptions.*

Where an injunction has been granted upon a bill in equity, and answers to the bill and exceptions to the answers have been filed at rules, the judge, upon the hearing in vacation of a motion to dissolve the injunction, may examine the bill, answers, and exceptions, and, if the exceptions are not well taken as to matters affecting the equitable ground upon which the injunction rests, he may disregard them. (p. 163).

2. MOTION TO DISSOLVE—*Vacation—Exceptions.*

The plaintiff in the injunction cannot deprive the defendant

of the benefit of his answer upon the hearing in vacation of his motion to dissolve, or postpone it until the next term, by so filing exceptions to the answer; for the motion and the exceptions may be taken up and heard at the same time and in vacation. (p. 163).

3. ANSWER—*Sufficiency—Exceptions.*

An allegation of the bill claimed not to be sufficiently answered is the only proper basis for an exception to an answer for insufficiency, and an exception which amounts to no more than a criticism of the answer, without setting forth any allegation of the bill and charging that as to it the answer is insufficient, will be disallowed as not well taken. (p. 165).

4. ALLEGATIONS DENIED—*Specially and Generally.*

When, in an answer, nearly all the material allegations of the bill upon which the prayer for relief is predicated are controverted in detail, and the respondent avers that he has aimed to answer fully each and every allegation, and believes he has done so, but, by way of general answer to all such allegations as have not been admitted or denied, says they are untrue, and demands proof of the same, such general denial, while not sufficient to constitute good pleading, if not properly excepted to in the court below will be considered by the appellate court as controverting such parts of the bill as are not specifically replied to. (p. 166).

5. TRUSTEE'S BOND—*Notice of Sale.*

The failure of a trustee in a deed of trust, who has voluntarily given a bond to faithfully perform his duty as such trustee, and account for and pay over all money that may come into his hands in the execution of such trust, to append, to his notice of a sale to be made under the deed of trust, a certificate of the clerk that such bond and security has been given, is not sufficient ground for enjoining the sale. (p. 167).

6. NOTICE—*Publication—Four Issues Sufficient.*

The publication of a notice of sale under section 7, chapter 72, Code, is complete on the fourth issue of the paper containing it, if it be published in the paper once in each successive week, though the four weeks have not actually elapsed between the dates of the first and last publication; and if a copy of such notice so published be posted at the front door of the court house of the county in which the sale is to be made, on the day of its first publication in the paper, it is sufficiently posted. (p. 167).

7. CONVEYANCE IN TRUST FOR CREDITORS—*An Appropriation.*

When the grantor in a deed of trust conveys all his property to a trustee for the benefit of his creditors, with power to sell the same immediately, and authorizes the trustee, after paying the expenses of the trust and discharging the liens on the property, to make a *pro rata* distribution of the proceeds of the trust

property among the grantor's creditors, and reconvey to him whatever may remain unsold in case the property shall be more than sufficient to pay all the debts, such deed is absolute, and the conveyance is to a trustee for the purpose of raising a fund with which to pay debts, as distinguished from a deed of trust in the nature of a mortgage to secure the payment of debts, and amounts to an appropriation of the property, so far as may be necessary to the accomplishment of that purpose. (p. 175).

8.  SALE UNDER CONVEYANCE FOR CREDITORS—*Enforced.*

The grantor in such deed thereby consents to an immediate sale of such property, and, such consent being analogous to that given by a debtor in a decree directing a sale of his property made and entered with his consent, he will not be permitted to enjoin such sale merely because the amounts of his debts, their priorities, and the persons to whom they are due and owing have not been ascertained, the amount to be raised by such sale is uncertain, and the legal title is outstanding in trustees in prior deeds of trust. (p. 176).

Appeal from Circuit Court, Harrison County.

Bill by James B. Sandusky against Samuel S. Faris and others. Decree for defendants, and plaintiff appeals.

*Affirmed.*

LEWIS C. LAWSON and M. G. SPERRY, for appellant.

C. W. LYNCH, W. SCOTT and JOHN BASSEL for appellees.

POFFENBARGER, JUDGE:

On the 6th of January, 1898, Jas. B. Sandusky being heavily indebted to various persons, but not in more than the aggregate sum of twenty-three thousand dollars according to his contention, executed a deed of trust in which his wife joined, conveying all of his real and personal property in the counties of Ritchie and Harrison to Samuel Faris in trust to secure the payment of certain liens on said Sandusky's lands therein specified in the order of their priority and the other judgments, debts and liabilities of said Sandusky; reserved to himself the right to collect and use the rents arising out of any of the houses on any part of the real estate conveyed, the right to operate the mills therein mentioned and enjoy the profits arising therefrom, and the right to use and occupy free from rent one of the buildings on said real estate until such time as a sale thereof should be desired by the trustee; and authorized the trustee to take immediate possession of the property so conveyed subject to said reservations and proceed to

make disposition of the same in such manner as he might deem best for all concerned, declaring it to be the intention thereby to grant unto the trustee free discretion in the execution of the authority granted him and to allow him to proceed at once to exercise the power thereby vested in him, and to institute such suit or suits as he might deem necessary to protect the said interests and to do and perform any and all acts, compromise, prosecute or defend any suit now or hereafter brought concerning said Sandusky's property or interest, sell and convey said real estate or any part thereof, and to lay it off into lots or parcels, lay off streets, alleys, etc., and if in his judgment the interests of all concerned will be promoted thereby cause said real estate to be surveyed, advertise any sale to be made by him for such length of time, and sell on such terms as he might deem best, and apply the proceeds of such sale to the payment of such liens in the order of their priority, and after such liens should be extinguished, then *pro rata* on all other debts and liabilities of said Sandusky, and after the payments of such liens and debts in full out of the proceeds of such sales, the trustee should reconvey to said Sandusky whatever should remain unsold of such real or personal estate.

The property conveyed by this deed of trust consists of a tract of land of about four hundred acres situated near the town of Bridgeport in Harrison County, a portion of which is in said town on which there are eleven one and a half story houses, said to have cost about four hundred dollars, each renting for about three dollars per month, all of which tract is said to be worth sixteen thousand dollars; a house and lot in said town known as the John Payne property and alleged to be worth four hundred and fifty dollars; another two-story frame house and about an acre of land therewith known as the W. E. Hill property and alleged to be worth one thousand two hundred dollars; a shop and lot in said town purchased of said Hill for three hundred and sixty-five dollars; a grist mill, and saw mill in said town and land upon which same are situated alleged to have cost seven thousand dollars; about five hundred and fifty-one acres in Ritchie County of which about four hundred acres are virgin forest, well timbered, all of which tract is charged to be worth eight thousand two hundred and sixty-five dollars; one-half of a tract of three hundred and seventy-two acres in Ritchie County, of which two hundred and seventy-five acres are improved and in grass, claimed

to be worth two thousand eight hundred dollars; a tract of about two hundred and ten acres in Harrison County known as the Jas. Coplin lands claimed to be worth seven thousand dollars, and personal property not itemized, claimed to be of the value of two thousand dollars.

The only liens specified in the deed of trust of January 6, 1898, are a judgment for five hundred and ten dollars and seventy-seven cents in favor of Jas. McDermott dated September 17, 1896, on which it recites three hundred dollars had been paid, and a judgment for three hundred and thirty-nine dollars and thirty-six cents dated May 11, 1897, and costs in favor of Otto D. Barnes; but the plaintiff admits in his bill that there are other liens and unsecured debts due and owing from him. The Jas. A. Coplin land was encumbered by a lien created by deed of trust executed by Coplin and wife and his mother dated August 16, 1888, to Kelso Pell, trustee, to secure to said Sandusky the payment of five thousand five hundred dollars in consideration of his agreeing to pay numerous debts due from Coplin to divers other persons. Said sum of five thousand five hundred dollars was evidenced by a note executed by Coplin to Sandusky and he assigned it to the West Virginia Bank as collateral security for debts and obligations due to it from Sandusky, amounting now as he claims, to about five thousand dollars, and said bank still holds said note and the deed of trust has never been released.

After these transactions, Coplin, by deed dated November 27, 1895, conveyed the land to Sandusky for and in consideration of all the debts then owed by him to Sandusky amounting to about six thousand dollars. On the 12th of August, 1895, Sandusky and wife by deed of trust bearing that date, conveyed the various lots and parcels of land at and near Bridgeport containing about four hundred acres to J. V. Blair, trustee, to secure to Silas Langfitt the payment of a certain writing obligatory executed by Sandusky to Langfitt for the sum of six thousand seven hundred dollars for borrowed money bearing even date with the deed, and to become due in three years after date, since the execution of which Langfitt has died intestate and Jas. V. Langfitt has qualified as his administrator, and the debt remains unpaid: Sandusky being one of the sureites on the bond of W. E. Hill guardian for Cecil M., Sadie B., Wm. H. and Hattie Kester, who having instituted suits in the circuit court of Harrison County against said guardian and his sureties, an erroneous decree in

their favor for sums amounting to about four thousand five hundred dollars was made and entered against said defendants in May, 1897. Said Hill and all of his sureties except Sandusky being insolvent, and he having obtained an appeal and *supersedeas* from this decree and desiring Jno. C. Johnson, W. M. Late, Jas. H. Hurry and John Duncan to become his sureties on the appeal bond, Sandusky and wife by deed dated November 22, 1897, conveyed to James Duncan, trustee, a tract of land in Ritchie County of forty-nine and one-fourth acres; another in same county of four acres more or less; Sandusky's undivided interest in another tract in said county of three hundred and sixty-six and one-fourth acres more or less; another in same county of sixty-three and one-fourth acres more or less; another in said county of fifty-nine acres; another in same county of twenty-nine acres more or less; another, same county, of three hundred and seven-eighths acres; two portable saw mills located on the three hundred and sixty-six and one-fourth acre tract; whatever interest he might have in the cases of *J. B. Sandusky* v. *Edwin Maxwell* surviving trustee, etc., *Gideon Nuzum, assignee,* v. *Edwin Maxwell,* surviving trustee, etc., and *J. B. Supler, assignee,* v. *Edwin Maxwell,* surviving trustee, etc., pending in the circuit court of Harrison County; all the right, title and interest of Sandusky in the one and one-half acre lot adjoining the house and lot lately owned by W. E. Hill in the town of Bridgeport; all the right, title and interest of Sarah A. Ford and Parley Ford in the estate of Cyrus Ross, deceased, it having been conveyed to Sandusky by them; all the interest of Jessee C. and Mary Webb in the estate of said Ross, it also having been conveyed to him, and a house and lot on Philadelphia avenue in said town of Bridgeport in trust to indemnify and save harmless said Johnson, Hurry, Late and Duncan as his sureties in said appeal bond.

Upon this appeal the decree of the lower court was corrected and affirmed, and at the January term, 1900, of the Harrison circuit court a decree was entered in the cause for sums aggregating two thousand eight hundred and eighteen dollars and ten cents with interest from May 11, 1897. During the pendency of that suit the deed of trust of January 6, 1895, was executed and the trustee therein advertised the property of Sandusky for sale, and another suit was instituted by John I. Alexander, guardian of said Kester infants, to collect the amounts so decreed to them out of said estate, and to enjoin and restrain said trustee from

selling said property under the deed of trust; and said Johnson, Hurry, Late and Duncan paid to Alexander, guardian, the amount due the Kester children for which they were liable as sureties in the appeal bond, amounting to the sum of two thousand eight hundred and eighty-six dollars and thirty-five cents at that time and the injunction was dissolved.

In a chancery suit brought in the circuit court of Harrison County by Moses W. Spencer to rescind a contract made between him and Sandusky for the sale of the Coplin land to him for six thousand eight hundred dollars there was a decree against Spencer entered which, upon appeal was reversed, and a decree entered therein against Sandusky for the costs amounting to three hundred and thirty-six dollars and twenty-two cents with interest from September 21, 1899. In addition to these sums Sandusky admits he is indebted to Kate Gawthrop in the sum of about seven hundred dollars; to Gideon Nuzum, about one thousand six hundred dollars; to Cyrus Thompson, administrator of John G. Thompson, about seven hundred dollars; to W. M. Late, on a judgment, about one thousand six hundred dollars and to different individuals in smaller sums.

Samuel S. Faris, trustee in the deed of trust of January 6, 1898, gave notice in January, 1900, by publication that on the 19th day of February, 1900, he would offer for sale at the front door of the court house of Harrison County, the Coplin land; and, on the 20th of February, 1900, on the premises, the four hundred acre tract at and near Bridgeport (part of which would be sold in lots ranging from one-half acre to twenty-five acres, all accessible by streets and alleys) ; the lot known as the Hill property of about one and one-eighth acres; such part as he might desire to sell of a two and one-half acre lot adjoining said Hill lot; the one-half acre lot on Philadelphia avenue; and a lot in Bridgeport containing about one-sixteenth of an acre; in which notice the terms of sale were fixed at one-third cash and the residue in two equal instalments, to become due in nine and eighteen months respectively from the day of sale.

On February 15, 1900, Sandusky presented his bill of complaint against Faris, trustee, and others to Hon. G. W. Farr, judge of the Fourth circuit, in vacation, who granted an injunction restraining said trustee from further proceeding with the sale of said property and from making any disposition of the same or of the proceeds of such of it as he had already sold until the further order of the circuit court of Harrison County.

The bill after setting forth what has been already stated respecting the property and debts of said Sandusky, alleges that, after Spencer had instituted his said suit to rescind the contract of sale of the Coplin land, Sandusky being greatly embarrassed, consulted with Johnson, Hurry, Late and Duncan and Faris as to what should be done to require Spencer to take the land at six thousand eight hundred dollars; that they induced him to believe the execution of the deed of trust would require Spencer so to do and relieve him of embarrassment, etc.; that he yielded to their advice and persuasion and executed it; that it was done in great haste and without mature deliberation under the influence and persuasion of said parties, late in the evening, in the office of the present counsel for said parties, without giving complainant time to make out or approximate the amount of his indebtedness or the individuals to whom it was due; that almost immediately Faris took charge of the property and advertised it for sale, and the Kester children brought their suit as aforesaid to convene complainants creditors and enjoin the sale, whereupon after the answers of Faris and his said sureites were filed, the injunction was dissolved, and Alexander, the guardian and next friend of said children, being induced and persuaded thereto by said parties or some of them, refused to appeal from the order of dissolution, and the Kester children brought another suit to remove Alexander as their next friend, and again enjoin Faris from selling, in which also the injunction was dissolved, and upon appeal to this Court, the order of dissolution was affirmed and the bill dismissed on motion of the plaintiffs therein; that after the Kester children sued as aforesaid Faris gave bond as trustee April 6, 1898, with Late, Johnson and others as sureties, and from the execution of the deed of trust and during the pendency of said several suits, Faris, Johnson, Hurry, Late and Duncan have been anxious to have the property sold without the intervention of a court of equity, and without having the amounts and priorities of complainant's debts fixed, and to that end, have been giving aid and assistance to Faris in his determined efforts to sell the same; that having had an opportunity in the suit brought by the Kester children to file their answers and have the cause referred to a commissioner and the amounts and priorities of the debts ascertained and fixed, they refused, and immediately thereafter Johnson, Late, Hurry and Duncan to

prevent such reference and ascertainment of the debts, etc., advertised the property for sale again; that through the influence of Johnson, Late, Hurry, Duncan and Faris and believing upon their representations it would inure to his benefit to have the property sold under the deed of trust, he filed his answers in said suits, asking the sale of the property, and the dissolution of the injunctions; that he has since learned such sale would not be to his interest and benefit; that Faris has sold about two thousand dollars worth of the personal property and has on hand several hundred dollars of the proceeds and has permitted the real estate to become very much impaired in value, by allowing the fencing to go down and the filth to grow, and has failed to rent the property and make it yield profit, or to pay the taxes which for the years 1898-9 remain unpaid; that he has part of the four hundred acre tract divided into lots in such manner as to injure complainant and his creditors against his known wish and desire; and a sale of them as intended by Faris would be detrimental and injurious to complainant; and about twenty thousand feet of lumber on the Ritchie County land which ought to be sold was near being destroyed by fire recently; that notwithstanding the provision in the deed of trust for complainant's benefit, Faris has prevented him from obtaining any benefit therefrom, notified some of the tenants occupying the houses not to pay him rent; enjoined him from sawing any of the timber on said lands; compelled a telephone company to pay him (Faris) twenty-one dollars for the privilege of placing twenty-one poles on the lands, and having divided the land at great expense, refuses to let complainant know much about the condition of his estate or what is being done respecting it; that Faris has been very friendly and intimate with said Johnson, Late, Hurry and Duncan with regard to the estate, and has sought their advice, wishes and desires, and they are urged and demanding that Faris proceed to sell it as advertised, and he believes said trustee is under their control and direction, and doing their bidding in these matters and carrying out their intention and desires; that they took advantage of his distressed condition mentally and financially, inducing him to execute said trust deed to Faris, and in doing so they were so urgent that complainant was not given time to properly execute it or to have an attorney of his own to prepare or supervise the execution of it, and he has since discovered that it was not executed as he intended, but on the contrary, Faris, by its

terms and provisions has almost unlimited power and authority over the property and complainant has no redress or control over the same, except through the intervention of courts of law or equity; that he is informed and believes there is a contract or understanding between Faris and Johnson, Late, Hurry and Duncan or some of them by which they are to become the purchasers of said property, to which end they are anxious that Faris make the sale before complainant's true financial condition can be ascertained, and upon such information and belief, he charges and avers the fact so to be, and he verily believes there is a conspiracy between Faris and said parties to injure him in that way; that complainant, Johnson, Hurry, Late and Duncan all reside in the same town, and are about the same age, and have been intimate, consulting freely with one another about business matters, and up to within the last few months they have been very friendly and continuously urged him to co-operate with them in forcing the property to sale, and he, believing in their advice, yielded to their persuasion for a time, and then from their actions and those of Faris, he became convinced that the sale as desired by them, was not to his best interests, and since his wishes became known they have been unfriendly toward him and have but little conversation and few transactions with him, and have protested against his interfering with their intentions to subject the lands to sale; that the deed of trust provides for the payment of judgment liens only and other persons not having liens on his property and the legal title to every part of said lands is outstanding in trustees Blair, Kelso, Pell and Jas. Duncan; that some of the trust deed liens are of long standing and the amounts unascertained, uncertain and unknown to complainant, and the amounts of indebtedness secured by said deed of trust to Faris, and to whom due and owing are unknown to complainant and to Faris, and Faris has no proper or reliable means of obtaining the amounts and priorities of said debts, or complainant's creditors without the intervention of a court of equity because he has not and cannot possibly obtain the necessary information, and the same is not known to complainant or any one else, and by reason of the numerous deeds of trust on the property and the litigation respecting the Coplin lands and uncertainty of the title, the sale, as advertised by Faris, will result in irreparable injury, loss and damage to complainant; that complainant is nearly sixty-five years old and the four hundred acre

tract near Bridgeport is the old homestead on which his parents had resided from a time prior to complainant's birth, to the time of their death, and he had hoped and intended to reserve and retain forever fifty or one hundred acres of it around his father's residence for his home, maintenance and support, which intention was well known to all of said parties, by his having filed an answer in one of the suits brought by the Kester children, alleging these facts and his desire and intention in that behalf, and praying a reference to a commissioner to have his debts ascertained and their priorities settled, and that he might borrow money on the residue of his property and pay off his debts, and this intended reservation was forgotten and overlooked by complainant in the execution of the deed of trust by reason of his mental distress and the haste in which it was done, under the persuasion of said Johnson, Hurry, Late and Duncan, and Faris intends to sell and dispose of said homestead; that when such reference could have been had and a decree afterwards entered, first subjecting to sale the lands other than said homestead, he is informed said parties stated that these were the very things they did not want done, and refused to file their answers, and paid off the amounts due the plaintiffs as aforesaid, and, complainant is informed and believes, in so doing, made the guardian and next friend of said children agree to dismiss the suit, and if necessary, appear in person in open court for that purpose, and said suit was dismissed upon the written request of said guardian; that Faris has been exceedingly active and energetic in opposing the object and purpose of said suits and preventing the ascertainment of said debts and fixing their priorities by a decree of court and now opposes such intervention, and instead of remaining neutral and quiet in the premises during the pendency of said suits as to the matters then in controversy as was his duty, he was very active in defeating said suits and bringing about the sale of said lands by himself for his individual interest and benefit and for the purpose of enabling Johnson, Late, Hurry and Duncan or some of them to purchase said lands at a great sacrifice and loss to complainant; and in order to bring about such results, Faris employed counsel to file answers for him and do what was necessary therein to defeat the same and bring about a sale of the lands by himself, without any necessity or excuse so far as he was concerned; that this conduct on Faris' part was prejudicial to complainant, and the expense thus incurred ought not to

be allowed to him in the settlement of his estate; that Faris has lately exhibited a disposition of ill-temper and indifference to him so that it has become unpleasant and disagreeable, and a great hindrance to the future settlement and disposition of said estate, and by reason of the action and conduct of Faris in relation to these matters and his intimate relations with said Johnson, Hurry, Late and Duncan, his brother-in-law, it is not advisable, proper or consistent that Faris should now be left to sell the lands and settle up complainant's estate and secretly settle up the accounts, debts and charges against the estate, and especially the matters wherein said other parties are concerned without the intervention of a court of equity, etc.; that after Faris had learned of complainant's purpose to ask for an order of reference in said cause as stated, and on the day he gave complainant notice of the sale as now advertised, he approached complainant and talked to him in a very harsh and disrespectful manner and attempted to explain to complainant that if he should try to interpose any objection or restraint upon him in the sale and disposition of said lands, he would do so at his own cost and peril, and such interference and any litigation growing out of it would result in complainant having to pay the costs on both sides; and on complainants refusing to consent to the sale, he used threats and stated in effect that he would never cease in his resistance and objections to a suit for the purpose of preventing such sale, but would use all means in his power to frustrate the object and purpose of complainant in having his debts ascertained and fixed by a decree of court, and a sale made under the direction and protection of the court; that is informed and believes the guardian of said Kester children upon the payment to him of their money by Johnson, Hurry, Late and Duncan assigned to them the entire amount decreed to them and costs amounting to three thousand nine hundred and sixty-five dollars and thirty-seven cents including a note amounting with interest to one thousand seventy-nine dollars and seven cents which belonged to said children and which was a credit on said decree, and on account of which decree they paid only two thousand eight hundred and eighty-six dollars and thirty-five cents, and although the assignment should have been for the amount actually paid, the assignees are seeking to enforce said assignment for the full amount of the decree against complainant; that the lands are not properly advertised by Faris according to the terms and provisions required

by law, or the deed of trust, the notice of sale having been published the first time on January 26, 1900, and could not therefore be published at least once a week for four successive weeks preceding the day of sale; that neither the notice or a copy of it was posted at the front door of the court house of Harrison County for a like period; nor on January 26 or any other time; and that no certificate of the clerk that Faris had given bond was appended to the notice, and the lands are not properly mentioned and described in it.

Such is the substance of the bill covering twenty-seven printed pages, except a rather lengthy statement concerning the timber on the Ritchie County lands and the probability that these lands will become productive, and valuable oil and gas territory.

The prayer is for an injunction preventing the sale advertised by Faris, his making any disposition of the proceeds of any of the property until the future order of the court except to pay taxes on the property, and the cost of the suit brought by the Kester children; for a reference to a commissioner; for a decree fixing the amounts and priorities of his debts; for a strict account on the part of Faris as trustee; for the appointment of a special receiver in the case; for the sale first of the lands other than the homestead in case a sale shall become necessary; for permission to redeem the homestead in case the other land shall not bring enough to pay all the debts; for the renting of the lands for oil and gas purposes and the application of the rents to the payment of the debts; and for general relief.

To this bill the defendants Faris, trustee, W. M. Late, John Duncan, Jas. H. Hurry and John C. Johnson tendered their separate answers, to which the plaintiff filed exceptions, which were overruled and the answers filed, and general replication was made thereto. Separate answers were filed by Thompson, administrator, J. V. Blair, trustee, G. S. Nuzum, O. D. Barnes, Catharine Gawthrop, the West Virginia Bank, and James Duncan, and were replied to generally. There were depositions taken and filed for the plaintiff of himself, P. M. Long, W. F. Stout, M. G. Sperry, J. R. Adams and Jas. M. Lyons in addition to which plaintiff filed his affidavit. For the defendants the affidavits of S. C. Denham, W. F. Williams, and Nathan Davis, J. D. Long, B. W. Havnar, V. L. Highland, Ed. Martin, T. H. Dunn, Oliver Rinehart, Frank Peck, W. C. Morrison, John Duncan and J. W. Bailey were filed.

On the 20th of March, 1900, the plaintiff moved the court to appoint a receiver in the cause, and on the same day, the defendants having given due notice, moved to dissolve the injunction, and on March 24, the injunction was dissolved, and the motion for the appointment of a receiver overruled.

The cause has come to this Court upon an appeal from, and *supersedeas* to this order, and the appellant insists that the circuit court erred, first, in passing upon and overruling, in vacation, his exceptions to the answers of several of the defendants; and secondly, in dissolving the injunction.

While it is true our statute provides that the exceptions to an answer "shall at once be set down for argument," (Code, chapter 125, section 54), it is not so provided, nor has it ever been held in this State that the complainant in a bill upon which an injunction has been awarded, may, by filing exceptions to the answer, deprive the defendant of its benefit, if it be sufficient, upon the hearing, in vacation, of a motion to dissolve. Nor can he thereby delay the hearing of such motion until the next term of court to the end that such exceptions may then be argued and disposed of prior to the hearing of such motion. With us, judges of circuit courts have unqualified jurisdiction by express statutory provision, to dissolve injunctions in vacation upon reasonable notice in writing having been given the opposite party of the time and place at which the motion will be made. Code, chapter 133, section 12. Clothed with this authority, it would indeed be strange and inconsistent, if they did not have jurisdiction to settle all questions, necessarily preliminary and incidental to its exercise.

As stated in *Richardson* v. *Donahoo,* 16 W. Va. 685: "The court should pass upon the exceptions filed to the answer before proceeding to finally hear the cause;" but this language does not even carry an intimation that such action must be deferred until the final hearing in all cases or that the court or judge cannot resort to the exceptions for any purpose until the cause comes on to be finally heard. That such exceptions may be considered upon a motion to dissolve an injunction, is supported by abundant authorities.

"On a motion to dissolve an injunction, objections of every kind to the answer may be made, and are then in order." *Gibson* v. *Tilton,* 1 Md. 352.

"A motion to dissolve the injunction and exceptions to the

answer may be taken up together and determined at the same time." *Salmon* v. *Claggett,* 3 Bland (Md.) 125.

"According to the chancery practice of this state, the motion to dissolve an injunction and the exceptions to the answer are heard and decided at the same time." *Keigler* v. *Savage Mfg. Co.,* 12 Md. 383.

The Maryland rule as laid down in these cases is subject to the qualification stated by the learned chancellor in *Salmon* v. *Claggett, supra,* as follows: "But, however, it may be in the English courts in this particular, it has long been the practice of this court to hear and decide upon the motion to dissolve and the exceptions to the answer at the same time; and I shall hereafter consider it as finally settled here that the motion to dissolve and all exceptions to the answer which may then be filed, shall be taken up and decided upon at the same time; not however, denying to the plaintiff the right, for the purpose of obtaining a sufficient answer to the full extent required by the bill, to except to the answer within the proper time, after the motion for a dissolution of the injunction has been disposed of. * * * * In this court the question presented on a motion to dissolve, on the coming in of the answer is not one which always or necessarily involves the merits of the whole case, as set forth in the bill; it may be, and not unfrequently is, much narrower; because this court recognizes the distinctions between the case on which the injunction rests, the material head of equity which entitles the plaintiff to an injunction, and that which forms the whole foundation of his prayer for relief; which although often, are not necessarily one and the same case; and therefore this question on a motion to dissolve properly extends only to the equitable grounds of the injunction, and no further."

Beach on Mod. Eq. Pr. s. 784 says: "The court will hear an argument upon the exceptions to the answer and upon the motion to dissolve the injunction at the same time." High on Inj. s. 1602 lays down the American rule as follows: "Hence it follows that exceptions to the answer will not *per se* prevent the dissolution of an injunction but the court will look into the exceptions upon the argument of the motion to dissolve, and will give them the weight to which they are entitled;" and in this connection, the author says a different rule prevailed under the English practice which has never been received with favor in this country.

In *O'Connor* v. *Starke,* 59 Miss. 481, the court says in discuss-

ing the procedure of the chancellor under the rule: "To determine these questions he must of course examine the bill, the answer and the exceptions. When he has done this, he disregards the latter, if he find that in no point of view they are well taken; and he does the same thing, even though he finds them well taken as to some aspects of the case, if he shall be of opinion that they in no way affect the merits of the motion to dissolve. If this be not the law, then the complainant can always, by filing the most frivolous and unfounded exceptions, defeat the hearing of the motion to dissolve, even though as in this case, the exceptions are filed after the motion to dissolve, and possibly for the express purpose of preventing a hearing of the motion." See also *Lewis* v. *Leak et al.,* 9 Ga. 95; *Mitchell* v. *Mitchell,* 20 N. J. 234.

If in the application of this rule, upon the hearing of a motion to dissolve in vacation, the order dissolving the injunction shows also that the exceptions to the answer were overruled, as it does in this case, it is not necessary upon an appeal from that order to determine whether it is error to include that ruling in the order as likely to prejudice the plaintiff's rights at the final hearing; for it cannot have that effect until a final decree is made carrying the error with it. If it shall be found that the injunction was properly dissolved the decree will be affirmed. It is not intended here, however, to intimate that such action was erroneous. The dissolution of the injunction necessarily overruled the exceptions to so much of the answer as related to the equities of the bill upon which the injunction was based, and certainly no harm could result from recording what was properly decided, although it may have been unnecessary, nor need it be said that because the language of the order carries on its face an apparently broader meaning, it really signifies more than that the exceptions were considered only so far as it was proper to do so in deciding upon the motion to dissolve the injunction.

The plaintiff filed four exceptions to the answer of Late, Johnson, Hurry and Duncan, and seven to that of Faris, but none of them are sufficiently specific to conform to the requirements of the rules of equity practice respecting such exceptions. They are mere criticisms upon the answers without setting forth any of the allegations of the bill as not being sufficiently answered.

In *Richardson* v. *Donahoo, supra,* this Court held that, "Exceptions are allegations in writing stating the particular points or matters with respect to which the complainant considers the

answer insufficient as a response to the bill, or scandalous, or impertinent. The object of exceptions is to direct the attention of the court to the points excepted to, and to take its opinion thereon before further proceedings are had to the end that if the answer is insufficient, a better answer may be compelled, or, if scandalous or impertinent, that the scandalous or impertinent matter may be expunged. Exceptions for insufficiency of an answer, according to the rules of equity practice, can only be sustained when some material allegation, charge or interrogatory in the bill is not fully answered. Exception founded on verbal criticisms, slight defects or the omission of immaterial matter will be disallowed and treated as vexatious."

Under this rule it is necessary in order to make an exception available, that it clearly designate the allegation in the bill in relation to which the answer is excepted to for insufficiency, and the better practice is to set it out in *haec verba.* 1 Barb. Ch. Pr. 176; 3 Barb. Ch. Pr. 422; Beach. Mod. Eq. Pr. s. 406; Dan. Ch. Pr. 6 Am. Ed. p. 2110.

As to all material allegations not expressly admitted in the answer of Faris, trustee, that answer is sufficiently responsive to the bill. After taking up and dealing directly with the allegations by way of denial and explanation, to the extent of over thirty-two pages of the printed record in which, as is also true of the bill, there is a great deal of matter which does not properly belong to pleading, the respondent says, "he has aimed to answer fully each and every allegation in the bill and either admitted or denied the same as the fact is, which he believes he has done, but by way of general answer to all such allegations as have not been either admitted or denied, says that all such allegations not heretofore replied to are untrue, and respondent demands and calls for proof of the same." As to an answer containing a similar clause this Court held in *Burlew* v. *Quarrier,* 16 W. Va. 108 that, "While this denial is general and not sufficient to constitute good pleading in chancery proceedings, if excepted to properly in the court below, still in absence of such exceptions in the court below, the appellate court will generally consider said part of the answer as controverting said material allegations of the bill." Taking this in connection with the apparent effort in good faith of Faris to answer all the allegations of the bill in detail and the failure of the plaintiff to designate by way of exceptions any particular allegations to which he desired

more complete answers, the bill must be considered fully answered.

The principal grounds upon which it is contended that the injunction should not have been dissolved are, that the notice of sale was insufficient for want of certificate showing that the trustee had given bond, and was not published and posted for the time required by law; that the trustee is unfriendly to complainant, and intimate with, and under the control and influence of some of his creditors; that the sale as proposed and advertised by him will be detrimental to the interests of complainant and his creditors; that complainant should be permitted to retain the homestead if the residue of the lands will sell for enough to pay off his indebtedness; that the amount of said indebtedness is unknown, uncertain and unascertainable except by a convention of his creditors in a suit in equity for that purpose; that no sale by the trustee should be permitted until the priorities of the liens are fixed by a decree of court, and that the legal title to the lands is outsanding in trustees Pell, Blair and Duncan.

That part of the statute requiring bond to be given by the trustee upon the demand of the grantor or any *cestui que trust,* is mandatory, but whether that part which says every notice of sale in such case shall have appended to it the certificate that the bond has been given is mandatory need not be determined here, as the question is not properly raised, for unless the bond was given upon the demand of the grantor or a *cestui que trust,* no such certificate need be appended. Faris admits that he gave the bond, but denies that it was required, and there is no evidence that any was required. Sandusky in his affidavit says the Kester children complained that no bond had been given, and Faris afterwards gave it, as he believes, in order to meet this complaint. This is clearly insufficient to overcome the positive denial of Faris and his averment that he voluntarily entered into the bond without any notice from any of the creditors, or their knowledge, except such of them as signed it as his sureties.

To the objection that the notice was not published and posted for four successive weeks, it would be sufficient to reply that the deed of trust authorizes the trustee to advertise the sale for such time as he may deem best. But there were four successive publications in four separate weeks, and at the date of the first publication, the notice was posted, as appears by the affidavits of Frank Peck, who posted it, and W. C. Morrison who saw it on

the bulletin board two or three days afterwards. It is not the duty of the trustee to stand over the notice and prevent its being torn down after it is posted, and the fact that persons who looked for, and did not find it after it was posted cannot be regarded as proof that it had not been posted. While not posted twenty-eight days prior to the date fixed for the sale, it was posted in the fourth week preceding that day, and, applying the construction placed upon our statute requiring publication of notice, in *Marling* v. *Robrecht,* 13 W. Va. 440, and *Miller* v. *Neff,* 33 W. Va. 197, the notice was sufficiently published and posted.

The allegations of unfriendliness, ill-temper and indifference on the part of Faris toward complainant and intimate relations with Johnson, Late, Hurry and Duncan or any of them respecting the subject matter of the trust are all denied, and are not supported by proof. It is claimed that the charge that on one occasion Faris approached plaintiff and "talked to him in a very harsh and disrespectful manner about what actions plaintiff sought in the premises;" and "used threats against the plaintiff and told him that he himself would never cease in his resistance and objection to a suit for the purpose of preventing such sale but would use all means in his power to defeat such suit, etc., * * * * and that such interference and any litigation growing out of the same would result in plaintiff's having to pay costs on both sides," etc., is not denied. The answer seems broad enough to cover this, and if plaintiff desired a more direct reply to it, he should have made the allegation the subject of a proper exception. But is the allegation itself sufficient?

It is general in its terms; the alleged harsh and disrespectful language does not appear either in the bill or the affidavit of Sandusky. The court has nothing from which it can inform itself as to the character of the language and conduct of Faris, except the plaintiff's opinion, and that is clearly insufficient. Nor can it be regarded as misconduct on the part of the trustee to tell the grantor he would resist an effort to have the trust executed under the direction of the court, if there was no ground for equitable interference. He owes a duty to the creditors as well as to the grantor, and must execute the trust in the most economical, advantageous, and expeditious manner possible under its terms, and he would not be warranted in leaving the manner of its execution to the determination of the grantor, nor can the action of the trustee in advising or notifying him that an unsuccessfull at-

tempt to interfere would be made at his own cost. If so, an offi-
cious or meddlesome creditor by provoking a quarrel with the
trustee might have him removed and the trust estate would be
continually passing from hand to hand in response to the whims
and caprices of grantors and creditors, with increasing expense
and complications.

The allegation that the sale as proposed by the trustee will
be injurious to the plaintiff and his creditors presents nothing
more than a difference of opinion between the plaintiff and Faris,
and this difference dates only from about the time the trustee
gave the last notice. For nearly or quite two years before that
time, Sandusky agreed with Faris and urged him to sell, and
resisted the opposition to the sale offered by the Kester children.
And he gives no reason for his change of opinion except that he
has become convinced from the actions and conduct of Faris,
Johnson, Late, Hurry and Duncan that such sale will not be
beneficial to him and his creditors.

The deed of trust by its terms vests in the trustee plenary
powers as to what part or parts of the land shall be sold, and as
to its division into lots with streets and alleys, and the bill does
not allege that such division and sale will be injurious. The only
objection is that the division should be made in a manner differ-
ent from that in which the trustee has made it, unsupported by
anything except the opinion of the plaintiff, against which stands
the covenant in the deed of trust by which that matter is left to
the discretion of the trustee, and also the opinion of the trustee
and principal creditors expressed in their answers.

The charge that it is the purpose of the trustee to unneces-
sarily subject the homestead to sale is denied, and is unsupported
by proof.

The remaining grounds upon which it is urged that the in-
junction should not have been dissolved have been virtually
passed upon in *Kester* v. *Alexander,* 47 W. Va. 329, (34 S. E.
819), in which Sandusky supported the action of Faris in ob-
taining the dissolution of an injunction, restraining him from
selling these lands; but the case comes back here at the instance
of a party who stands in a different relation to the subject matter
of the trust.

Where, from any cause, the amount due and to be raised by a
sale is uncertain, such uncertainty is an impediment to the proper
execution of the trust, and application may be made by the trus-

tee, the grantor or any of the beneficiaries of the trust, to a court of equity to have it removed. *Gibson* v. *Jones,* 5 Leigh 370; *Wilkinson* v. *Gordon,* 11 Leigh 547; *Hogan* v. *Duke,* 20 Grat. 244; *Curry* v. *Hill,* 18 W. Va. 370; *Hartman* v. *Evans,* 38 W. Va. 669.

But to sustain an injunction upon the ground of such uncertainty the complainant must sufficiently allege it, and if it be denied in the answer, he must prove it. The bill in the case at bar sets forth no facts from which such uncertainty appears. It only alleges that he does not know the amount of his debts, that the trustee is not informed as to them, that they are uncertain, and that they cannot be ascertained except by a reference to a commissioner for that purpose. It is clearly not enough to allege such uncertainty in terms. It ought to appear that, as in *Curry* v. *Hill,* and *Hogan* v. *Duke, supra,* certain credits are claimed on one side and denied on the other; or the collection of certain improper claims is sought to be effected by the execution of the deed of trust. Such allegations until denied constitute a *prima facie* case. Here the charge of uncertainty, if it could be held to be sufficiently alleged, is denied, Faris having sat out in his answer, by items, what he is informed and believes to be the bulk of Sandusky's indebtedness, amounting with interest in the principal items to twenty-seven thousand seven hundred and thirty-two dollars and seventy-three cents. The plaintiff files his affidavit, denying that he owes some of the smaller sums named, but the validity of none of these claims is questioned by him in his bill. As to the amount so stated as due Mrs. Potter, three hundred and twenty-five dollars on note; J. H. Hurry two hundred dollars on note, and W. Scott, three hundred dollars for services as attorney, he simply says he does not owe them. He does not deny having executed the notes or that Scott rendered him such service, nor does he claim to have paid them in whole or in part. In this affidavit he says he made payments to S. C. Denham, deputy sheriff, who claims five hundred and thirty-four dollars and twenty-six cents to be still due him on account of taxes about seven hundred and sixty dollars, and that the amount of the taxes was only about eight hundred and fifty dollars. While affiant does not say he makes the statement in reference to these payments upon information and belief, it appears that none of them were paid by him personally, but were, except two items of one hundred and eighty-four dollars and seventy-five dollars,

sums affiant claims Denham realized from sales of property made by him under tax levies. The one hundred and eighty-four dollars is the amount of a note on Newton Low which he says he turned over to Denham and was collected by him; and the seventy-five dollars he claims, was rent paid by the tenant of one of the houses. He makes no claim that Denham has failed or refused to credit any of these sums, on the taxes, nor has he taken the testimony as to any of these matters of a witness who has personal knowledge of them; while Denham swears there is a balance due him on account of the taxes of five hundred and forty-three dollars and twenty-six cents after allowing credit for all monies and property of Sandusky received by him. He also denies that he owes John Duncan forty-three dollars and thirty-three cents, and three hundred and eighty-eight dollars and forty-one cents mentioned in said answer, and says he has no recollection of any such note and there is a settlement between them in which he should have credit for about two hundred and fifty dollars worth of lumber, sold to Duncan about three years ago. Duncan makes affidavit that after crediting him with one hundred and ninety-eight dollars and five cents for lumber received in the winter of 1895 and 1896, there remains due him four hundred and fifty-seven dollars and twenty-five cents including interest and some claims he holds as assignee of other parties. He claims one hundred dollars has been paid on the claim held by Cyrus R. Thompson, administrator, and Thompson admits it. He also claims two one hundred dollar payments have been made on the Catharine Gawthrop seven hundred dollar claim. She shows judgment was recovered by her on the note in May, 1899, for six hundred and thirty-one dollars and eighty-three cents which fact is conclusive of credit for something having been given prior to that time, and Sandusky does not claim to have made any payment on the judgment and it is not probable that he did, as it was recovered only a few months before the assignment. He also says there is a settlement to be made between him and P. C. Nuzum whose claim is stated to be sixty-three dollars and sixteen cents.

This affidavit and the bill fail to show any effort on Sandusky's part to find out what his debts were, or as to what items or matters there will be conflict between him and any of his creditors. As to the discrepancies to which he refers in his affidavit, he neither alleges nor swears to any effort to ascertain whether there

is any real dispute, nor any attempt on his part to effect a settlement. Upon the bill in *Hogan* v. *Duke, supra,* which was much more direct and specific in its allegations than this one, Moncure, P., made the following criticism: "The bill does not allege any attempt by the plaintiff to have a settlement of any of these matters with Duke, or any refusal of Duke to settle them. On the contrary, it alleges that he promised to credit them but has failed to do so. *Non constat* that he was not willing to credit them, when the balance due on the bonds was ready to be settled either by the debtor, or out of the proceeds of the trust sale of this property."

There is no allegation here that Faris will pay any improper claim or refuse to compel the allowance by the creditors of any credit to which Sandusky is entitled.

In regard to another fact in the above case upon which an attempt to uphold the injunction was predicated, the opinion says: "It is outside of the pleadings in the cause," and such is true of the matters set up in the affidavit, and herein referred to. But this doctrine of the uncertainty in the amount of the indebtedness is not ordinarily applicable to the case under consideration to the extent contended for as will be shown later on.

At the time said deed of trust was executed to Faris for the benefit of Sandusky's creditors, there were a number of liens on the real estate thereby conveyed, but it does not appear that there is any contention among the lienors as to priority, or any question raised as to their validity. It is error to decree a sale of the lands without first ascertaining the amount of the liens and their priorities for the reason that a sale under such a decree has a tendency to sacrifice the property by discouraging creditors from bidding as they probably would, if their right to satisfaction of their debts and the order in which they were to be paid out of the property had been previously ascertained. *Coles Adm'r* v. *McRea,* 6 Rand. 644; *Cralle* v. *Mee,* 8 Grat. 530; *Buchanan* v. *Clarke et al.,* 10 Grat. 165; *Moran* v. *Brent,* 25 Grat. 104; *Simmson* v. *Lyles,* 27 Grat. 922; *Kendrick et al.* v. *Whitney,* 28 Grat. 646; *W. A. & G. R. R. Co.* v. *A. & W. R. Co.,* 19 Grat. 592; *Livesay's Ex.* v. *Jarrett,* 3 W. Va. 283; *Murdock's Admr.* v. *Wells,* 9 W. Va. 552; *Wiley* v. *Mahood et al.,* 10 W. Va. 206; *Marling* v. *Robrecht et al.,* 13 W. Va. 440; *Scott et al.* v. *Ludington et al.,* 14 W. Va. 387; *Payne & Green* v. *Webb et al.,* 23 W. Va. 558; *McCleary* v. *Grantham,* 29 W. Va. 301.

But this is not an appeal from a decree of sale. The debtor here is not confronted with a sale of his property without his consent as in those cases in which he is brought into court as an unwilling defendant to a bill to enforce a judgment lien against his real estate, and in which he makes and preserves his objection to an irregular decree or an improper one. Nor is this a case in which the deed of trust was executed merely to secure the payment of money, the sale under which is dependent upon failure to pay the debt, and the demand of the creditors that sale be made. In such cases immediate sale of the debtors property is not assented to nor contemplated by him. He has waived none of his defenses nor rights and may resist the sale upon any legal or equitable grounds that may be open to him. But if, when he comes into court for relief, or is brought in as a defendant, he consent to a decree for the immediate sale of his property, without an adjustment of the amounts and priorities of the liens thereon, he is irrevocably bound by his consent, and can never be relieved from the decree except by consent of all other interested parties, or by showing that his consent was obtained by fraud or the decree was so entered by mistake. *Estill & Eakle et al.* v. *McClintic's Admr. et al.,* 11 W. Va. 399; *Marrion* v. *Fahy,* 11 W. Va. 482.

The sale sought to be enjoined in this cause is analogous to a sale under such a decree. Sandusky, the debtor, is bound by the authority given in his deed of trust for immediate sale of his property, and the consent of the creditors to such sale will be presumed until the contrary is made to appear; and if the assignment be free from fraud and legally sufficient they too are inextricably bound by it except in relation to their vested rights in the property as lienors, or some matter of detail or procedure on the part of the trustee to which they have not expressly consented. In this instance none of the creditors are here disputing the trustee's authority to sell, or showing any reason why sale should not be made; on the contrary they are insisting that it be made. Under such conditions, how can Sandusky who has given his consent by the solemn covenant of his deed, be heard to object? If it be true that the legal title is outstanding, and Faris can only sell the equity of redemption, and the purchaser from him will take the lands subject to the liens existing at the time of the general assignment, has not Sandusky assented to that also? Upon what authority can he be permitted to

retract his consent? He is presumed to have known the condition of his property at the time he executed the deed of trust.

It was his duty to know it and he cannot now be heard to deny such knowledge as the basis of forcing his creditors to accept a new and different arrangement for their benefit unless it be under peculiar circumstances which do not appear here. By this it is not intended to say that under special and peculiar circumstances overcoming the presumption of the debtor's knowledge of the condition of his estate and presenting a strong case, he may not invoke the powers of a court of equity in his behalf, but that ordinarily, and in the absence of such circumstances, he cannot do so as to matters clearly involved in and covered by his consent.

To what extent and in what respects a deed of trust made for the benefit of a debtor's general creditors differs from an ordinary deed of trust, it is not necessary, upon the state of the pleadings in this case and the questions brought here on appeal, to decide; but that there is a marked difference, which warrants the position taken in this opinion respecting the power of the plaintiff in resisting the sale he has authorized, cannot be doubted.

"There is a manifest and well settled distinction between an unconditional deed of trust and a mortgage or deed of trust in the nature of a mortgage. The former is an absolute and indefeasible conveyance of the subject matter thereof for the purpose expressed; whereas the latter is conditional and defeasible. A mortgage is the conveyance of an estate, or pledge of property, as security for the payment of money, or the performance of some other act, and conditioned to become void upon such payment or performance. A deed of trust in the nature of a mortgage, is a conveyance in trust by way of security, subject to a condition of defeasance, or redeemable at any time before the sale of the property. A deed conveying land to a trustee as mere collateral security for the payment of a debt when due, and with power to the trustee to sell the land and pay the debt, in case of default on the part of the debtor, is a deed of trust in the nature of a mortgage. By an absolute deed of trust, the grantor parts absolutely with the title, which vests in the grantee unconditionally, for the purpose of the trust. The latter is a conveyance to a trustee for the purpose of raising a fund to pay debts; while the former is a conveyance in trust for the purpose of securing a debt, subject to a condition of defeasance." Bartley, Judge, in *Hoffman* v. *Mackall,* 5 Ohio St. 124.

"When the grantor in a deed of trust makes it in contemplation of insolvency, and authorizes the grantee, after paying the expenses of the trust, to make a *pro rata* distribution of the proceeds of the trust property among the grantor's creditors, such deed is absolute, and the conveyance is to a trustee for the purpose of raising a fund with which to pay debts, as distinguished from a deed of trust in the nature of a mortgage to secure debts." From syllabus of same case.

This is held also in *Briggs* v. *Davis,* 21 N. Y. 574, in which the syllabus reads: "Where there is a valid trust for the sale of land, the party creating the trust and those holding the derivative titles under him, have no rights, legal or equitable, until the purposes of the trust are satisfied. Their interests are subject to the execution of the trust absolutely; so that a subsequent grantee, from the creator of a trust to sell for the payment of debts, acquires no right to redeem the land." This distinction is recognized and declared in *Woodruff* v. *Robb,* 19 Ohio Rep. 216; *Cower* v. *Constantine,* 86 Ala. 492; *State* v. *Benoist,* 37 Mo. 500; *Crow* v. *Beardsley,* 68 Mo. 435; *Hargdime* v. *Henderson,* 97 Mo. 375; *Mills* v. *Williams,* 31 Mo. 447; *In re Zwang,* 39 Mo. Ap. 356; *State* v. *Hemingway,* 69 Miss. 491; *Fromme* v. *Jones,* 13 Iowa 480; *Bartlett* v. *Teah,* 1 McCrery (U. S.) 176; *Martin* v. *Hausman,* 14 Fed. Rep. 160; *Weber* v. *Mick,* 131 Ill. 521; *Hershiser* v. *Higman,* 31 Neb. 533; *Johnson* v. *Roberson,* 68 Tex. 399.

Upon these authorities as well as upon reason, it is asserted in Burrill on Assignments, 12: "An assignment is more than a security for the payment of debts; it is an absolute appropriation of property for their payment. It does not create a lien in favor of creditors upon property which in equity is still regarded as the assignors, but it passes both the legal and equitable title to the property absolutely beyond the control of the assignor, and the trust which results to the assignor in the unemployed balance does not indicate such an equity." Again: "An assignment for the benefit of creditors implies the actual transfer of the property to an assignee or trustee, so that the assignor is devested of all control over it." Beach on Trust & Trustees, s. 596.

"A distinction should be noted in this connection between unconditional deeds of trust to raise funds for the payment of debts, and deeds of trust in the nature of mortgages, the former

being absolute and indefeasible conveyances for the purposes of the trust, while the latter are conveyances by way of security, subject to a condition of defeasance." Pom. Eq. Jur. s. 995.

Giving an assignment or deed of trust for the benefit of creditors this character does not preclude the assignor from the incidental right to discharge the trusts thereby created in favor of his creditors by paying off the debts before sale and thereby placing himself in a position to demand a re-conveyance of the property, or the right to claim a reconveyance of the residue, remaining unsold after the debts are paid, or in such case, payment of the residue of the proceeds. But there is no estate or interest in the assigned property remaining in him that he can convey or incumber as against the creditors, and he cannot prevent an immediate execution of the power of sale with which he has clothed the trustee, for the deed of trust creates at once the relation of trustee and *cestui que trust* between the assignee and the creditors, and the latter have the right to demand the enforcement of it according to its terms.

From this view of an assignment for the benefit of creditors, it is clear that it virtually amounts to a conversion or an appropriation of the property assigned, so far as may be necessary to effectuate the purposes of the trust. The debtor having appropriated his property to the payment of his debts, authorized and directed its immediate sale, his further interest in it amounts to little, if anything, more than a right to have an accounting on the part of the trustee. This he may have, and if by the negligence or misconduct of the trustee, part of the property should be lost or sacrificed or illegal claims be paid out of the estate, he must respond in the settlement of the account. The law permits the debtor to select his own trustee if the person selected be not disqualified in some way. By consenting to an immediate sale and conversion of his property into money, he may place it in the hands of some one in whose capacity and integrity he has confidence, besides requiring a bond from him, and thus put it beyond the reach of his creditors in any effort they may make to subject it by ordinary legal proceedings. He is permitted to thus delay his creditors in consideration of the surrender of his property for their benefit. Therefore, any interference on the part of the court at his instance to prevent the execution of the power of sale must be based upon much stronger grounds than ordinarily appear in cases relating to sales of property under

deeds of trust merely to secure the payment of debts, conveyances with conditions of defeasance, or predicated upon proceedings to enforce ordinary liens.

This case presents no such grounds, and for this and other reasons herein given, the decree of the circuit court must be affirmed.

*Affirmed.*