# CHARLESTON.

MILLER *et al. v.* NEFF'S ADM'R *et al.*

*(GREEN, JUDGE, Absent.)

Submitted September 7, 1889.—Decided November 18, 1889.

1. ADMINISTRATOR DE BONIS NON—APPEAL—PARTIES.

When there is a decree in the Circuit Court against an administrator for money to be paid out of the assets in his hands to be administered, and the administrator then dies, and an administrator *de bonis non* is appointed by the proper authority, *held*, (1) such administrator *de bonis non*, and not the administrator of the deceased administrator, is the proper party to appeal from such decree; (2) such administrator *de bonis non* may, within the time prescribed by law, petition for an appeal from such decree, stating therein the death of the former administrator, and exhibiting the order appointing him administrator *de bonis non;* and it is not necessary for him to make himself a formal party to the record by an order of the Circuit Court before petitioning for such appeal.

2. NOTICE—DEPOSITIONS.

The publication of notice to take depositions under section 2, c. 121, Code, which requires the notice to be published once a week for four successive weeks, is completed on the fourth issue of the newspaper containing it; and if a reasonable time elapses between the date of said fourth issue and the taking of the depositions the notice will be sufficient.

3. GIFT—DONOR AND DONEE.

To constitute a valid parol gift, there must be an actual delivery of the thing given, but the delivery must be according to the nature of the thing given, and if the property is at the time in the possession of the donee, as agent for the donor or otherwise, it is not necessary that the donee should surrender to the donor his actual possession, in order that the latter may re-deliver the same to him in execution of the gift; but if the donor relinquishes all dominion over the thing given, and recognizes the possession of the donee as being in his own right, and the latter accepts the gift and retains the possession in virtue thereof, the gift is complete

4. GIFT—DONOR AND DONEE.

A case in which this Court held, under the facts and circumstances disclosed by the record, a gift *inter vivos* by an aunt to her nephew of certain money, which was shortly before, and, perhaps, at the time of, the gift in the possession of the donee, as the agent of his aunt, was a valid and complete gift.

---

*On account of illness.

*Flick & Westenhaver* and *W. F. Dyer* for appellants.

*R. White* and *S. L. Flournoy* for appellees.

SNYDER, PRESIDENT.

Suit in equity, commenced November 3, 1877, in the Circuit Court of Hardy county, by John Miller and others, as the heirs and distributees of Elizabeth Neff, deceased, against the administrator of George S. Neff, deceased, and others. The cause was subsequently removed to the Circuit Court of Berkeley county, which latter Court, on May 15, 1886, pronounced a decree in favor of the plaintiffs against William Fisher, administrator of George S. Neff, deceased, for the sum of $24,580.12, with interest and costs, to be paid out of the assets of said George S. Neff in the hands of his administrator to be administered. · Soon after the rendition of this decree the defendant William Fisher, administrator *etc.*, died, and on July 8, 1886, Samuel A. M. Mechen was duly appointed administrator *de bonis non* of the estate of George S. Neff, deceased. Afterwards, on May 14, 1888, on the petition of said Samuel A. McMechen as such administrator, an appeal was allowed him from the aforesaid decree by one of the judges of this Court. The said McMechen was not by any order of the court below made a party to the suit, but he states in his petition for the appeal the death of said Fisher, and the fact that he had been appointed such administrator *de bonis non*, and exhibits therewith a certified copy of the order so appointing him administrator. On this state of facts the appellees, by their counsel, moved this Court to dismiss the appeal upon the ground that the same has been improvidently awarded.

This motion, as I understand it, is based upon two grounds: *First*, that the appellant had never been made a party to the cause in the Circuit Court; and, *second*, that the appeal should have been by the administrator of William Fisher, who had been the administrator of George S. Neff. This latter ground would, no doubt, have been valid, if the decree had been against Fisher in his own right, *de bonis propriis*, for assets of Neff converted by him; but the decree explicitly states that the recovery is against

Fisher in his representative character—that is, for assets of Neff in his hands unadministered, which is equivalent to a decree for assets unconverted. The unadministered or unconverted assets always pass to the administrator *de bonis non*, and must be administered by him, and not by the administrator of the first administrator. Section 8, c. 85, Code 1887. This ground is, therefore, not well taken. In respect to the other ground, I think it is equally untenable.

We are referred to a number of authorities, to show that only a party or privy to the record in the Court below can take an appeal. An administrator is surely a privy to the record, whether he is appointed before or after the decree appealed from. He stands in the place of his intestate, and represents his title and interests. But, as appeals are creatures of the statute law, we can only look to it, and to the decisions under it, for the doctrines in relation to them. 2 Tuck. Bl. Comm. 329. Turning to our statute, (section 2, c. 135, Code) we find that "any person who is a party to such controversy * * * may present his petition for an appeal." The administrator, as soon as he qualified, became a party to the controversy, and was therefore, under our statute, a person who could present his petition for an appeal.

The only case cited for the appellees having any true bearing on the question is *Taylor* v. *Savage*, 1 How. 282, 2 How. 395. This case was decided under the provisions of the statute law of Alabama. The appeal was taken in the name of the deceased administrator, and the only question decided was that the administrator *de bonis non* could not, by simply appearing in the appellate court and filing an appeal-bond, become such a party to the suit as would entitle him to prosecute the appeal. But, whatever may be the purport of this decision, and of other cases cited by counsel from other jurisdictions, it is not binding authority upon this Court; for in *Phares* v. *Saunders*, 18 W. Va. 336, this Court, upon consideration of the direct question, held that "the right to bring a writ of error in case of the death of a party against whom the judgment was rendered will be in the personal representative, without a revival of the judgment, because the personal representative stands in the shoes of the deceased, and has the same rights as his intestate had with

reference to the judgment." This conclusion, we think, is altogether reasonable and proper, and have therefore no hesitation in reaffirming and applying it to this case. The motion to dismiss must therefore be denied.

The counsel for the appellant have assigned and discussed several technical errors in the record; but, in the view this Court takes of the cause, it is unnecessary to consider these errors. We will therefore proceed to the determination of the merits of the cause.

The bill was filed by the distributees of Elizabeth Neff, deceased, to charge the estate of George S. Neff, deceased, with $10,000.00, the proceeds of thirteen negro slaves sold in December, 1856, by said George S. Neff, as the agent of said Elizabeth Neff. The bill avers that at the time of said sale the said Elizabeth Neff was old and infirm, and unacquainted with business matters; and that said money was allowed to remain in the hands of said George S. Neff, in trust, to be invested and used by him as her agent; and that it did so remain until her death, which occurred in June, 1865; that the said Elizabeth was unmarried, and died without children, leaving the plaintiffs and others, her brothers and sisters, and their descendants, as her next of kin and distributees; that in June, 1866, the said George S. Neff qualified as the administrator of the estate of said Elizabeth, and soon thereafter filed in the recorder's office of the county an inventory and appraisement of the estate of said Elizabeth, but no part of said $10,000.00 is embraced therein, nor has the said George, or his administrator, ever in any manner accounted for the same, or made any settlement of said estate; that in September, 1866, the plaintiffs instituted their suit in the said Circuit Court of Hardy county against said George S. Neff, as administrator of said Elizabeth, to obtain a settlement of his accounts as such administrator, and to charge him with said money, which suit was, at the September term, 1877, dismissed without prejudice; that the right to prosecute any suit against said George S. Neff for the recovery of said money was obstructed by war from April 17, 1861, to June, 1865, and from the latter date to May 27, 1866, the courts of Hardy county were closed, and there were no officers in said county by whom process could be lawfully issued.

The administrator of said George S. Neff filed his answer to said bill, in which he averred that after the sale of said slaves the proceeds of the sale were, in January, 1857, deposited in the bank at Moorfield; that respondent's intestate then reported the fact to said Elizabeth, and that she then gave him the said money, and directed him to take it, and do as he pleased with it; that he accepted said gift, took charge of the money, and, with the full knowledge and consent of his aunt, the said Elizabeth, from that time until her death, used and disposed of it as his own; that said money was never any part of the estate of said Elizabeth; and that the appraisment bill referred to in the plaintiffs' bill embraced the whole of said estate, and all that ever came, or ought to have come, into his hands as administrator.

The parol testimony in the cause relates mainly to the relations existing between the said George S. Neff and his aunt, the said Elizabeth, the acts and declarations of said Elizabeth in respect to said slaves and money, the services rendered to said Elizabeth by said George, and a general history of the said George and his aunt, and their families. Many of the depositions taken on behalf of both the plaintiffs and defendant are incompetent, being the depositions of the distributees of the respective parties as to communications and transactions had personally between the witnesses and the decedent against whom they claim. The Circuit Court properly sustained the exceptions to this testimony, and excluded it.

But there is one deposition, that of George Flanagan, an exception to which by the plaintiffs, we think, the Circuit Court improperly sustained. This deposition was taken at McMinnville, in Warren county, State of Tennessee, on August 8, 1870, in the former suit between the same parties, and, by agreement in this suit made in September, 1878, all the depositions in that suit, subject to all exceptions appearing on the said depositions or otherwise, shall be read as evidence in this cause. No exception was ever indorsed on this deposition for insufficient notice of the taking of it, but the court, in an order entered December 19, 1883, suppressed it, upon the ground that it was taken without reasonable and proper notice. The first publica-

tion of the notice was on July 8, 1870, and the fourth on July 29, 1870. The statute provides that any such notice may be served by publication once a week for four successive weeks. Section 2, c. 121, Code 1868. In *Marling* v. *Robrecht*, 13 W. Va. 440, this Court held that the publication of the notice provided for in section 4, c. 129, Code, for four successive weeks is completed on the fourth issue of the newspaper containing it, though the four weeks have not actually elapsed between the dates of the first and last publication. The statute under which that decision was made, and the one now in question, contain the same requirement as to the time of publication. The fourth publication of the notice here was nine days before the deposition was taken. It seems to me, therefore, under this authority and the circumstances above stated, that the Circuit Court clearly erred in suppressing said deposition.

Excluding the incompetent and considering only the admissible evidence, the record shows that Elizabeth Neff was an aged maiden lady, who had lived all her life with her brother Jacob, the father of George S. Neff. Her personal property consisted of a family of about thirteen slaves, which had been raised and supported on the farm, and with the family of her brother Jacob. These slaves, for the want of proper control, were indolent, impudent, and insubordinate, and by the winter of 1856 had become so lazy, unprofitable, and vicious that they were a terror and burden to their owner, and an annoyance and subject of complaint by the neighbors. Elizabeth had a number of brothers and sisters, the most of whom removed to the west in early life, where they resided all their lives, and all of them appear to have died, leaving children, most of whom are proceeded against in this suit as unknown parties. George S. Neff was her favorite nephew. She was very fond of him, and he, in turn, was very kind and attentive to her. Even after he married and removed from the home of his father and aunt, to a farm about two miles distant, he looked after his aunt's business, and attended to her wants, whenever she requested him to do so, or required his services and assistance.

As early as 1853, she had expressed her purpose to give to George everything she had. She seemed to be reluctant to

sell these slaves, but, owing to their insubordination, her fear of them, and the complaints of her neighbors, she, in the fall of 1856, consented to sell them provided they were taken from the State; and she then told George to take them off, and do what he pleased with them. Thereupon George and Robert J. Tilden arrested these slaves, and took them and another slave, belonging to Jacob Neff, to Baltimore, and there sold them on January 8, 1857, giving to the purchaser a bill of sale signed: "ELIZABETH NEFF. GEORGE S. NEFF, Agent." The gross price of all the slave was $10.000.00 When George and Tilden returned, the proceeds of the sale were first deposited in the bank at Moorfield, to the credit of George, but were shortly afterwards transferred to the credit of Tilden. The date of the credit to Tilden was January 21, 1857, and within less than a month thereafter Tilden checked out the whole of this fund, and all of it, except Tilden's commissions for the sale and expenses, was paid to George S. Neff, or to his order, and he retained, loaned, and disposed of it in his own name, and as his own property, ever thereafter. For the year 1857 the proceeds of these slaves were assessed in the name of Elizabeth Neff, but for the year 1858 they were transferred to, and assessed in, the name of George S. Neff.

These facts are fully proven, and the important inquiry, and the only one seriously controverted in this case is, whether or not Elizabeth Neff at any time made a complete gift of the proceeds of said slaves to the said George S. Neff. The plaintiffs have introduced in evidence various declarations of Elizabeth, and circumstances tending, more or less, to show that she never did in fact make a gift of the *slaves* to George; but, with the exception of a single witness, they offer virtually no competent evidence to prove, or even tending to prove, that she had not given the *proceeds* of said slaves to George. This witness was Susan Ellis, a slave of Jacob Neff. She testified that in December, 1864, Elizabeth Neff was talking about one thing and another, and she said that "she had never covered any money for her negroes; that she was never asked by George Neff if she wanted her money, or should he keep it, or put it out at interest, or in the bank." On cross-examination this witness testified that

George had at one time offended her, and that she was not in a very good humor about it yet. It is apparent that this witness was both ignorant and prejudiced, and her testimony, even if honest, ought to have but little influence, in the face of the other testimony and undisputed facts in this cause; and moreover, it is very improbable that the old lady would have had any serious conversation about her business with one of her brother's slaves.

On the other side, in addition to the facts and circumstances above mentioned, three competent witnesses—George Flanagan, Charles A. Heath, and James Wolf—testify positively that Elizabeth Neff told each of them, that she had given the proceeds of said slaves to George; and another witness, George P. Williams, who can not recollect the words she used, says it is his impression, from a conversation had with Elizabeth Neff, that she had either given said slaves or their proceeds to George S. Neff. George Flanagan testified that after the sale of the slaves Elizabeth Neff knew that George S. Neff had the money, and was loaning and disposing of it as his own; that she approved of these facts; and that he heard her say frequently that she had given said money to George. He also says the other relatives of Elizabeth Neff knew this fact, and that it caused ill feelings on their part. Heath, in answer to the question, "State, if you know, what Betty Neff did with the money the negroes brought," testified as follows: "I went over to Uncle Jake Neff's a short time after the sale of those negroes, and told Betty Neff she had so much money I would marry her—jesting on my part, of course. She said she would marry me, but she had no money; for she had given it to George S. Neff." He further testified that he had frequently—two or three times—heard Betty Neff say that she had given that money to George. On cross-examination the counsel for the plaintiffs propounded this question: "Did not Betty Neff say, in regard to the money arising from the sale of the negroes, that George S. Neff had the money, or are you willing to swear positively that she said she had given it to him?" and his answer is: "She said she had given it to him. She said: 'George has got the money. I gave it to him; and, if you take me, you must take me without the money.' I remember distinctly that she said she gave it to him."

To contradict this witness, one of the counsel for the plaintiffs testified that about two years before, he had a conversation with Heath, and, without being able to give the words used, he says that he is positive that Heath then said that Betty Neff told him that George Neff had the money arising from the sale of the negroes, and further stated that she did not say whether she had given it to him or not. This difference is not very material, if taken in connection with the further fact testified to by Heath, and which is not disputed, that she told Heath, if he married her, that he would have to take her without the money, as George had the money.

This would show that the money was not hers, but George's, and that she must have meant that she had given it to him. The other witness, James Wolf, in answer to the question, "State, if you know, what Betty Neff did with the money they (the slaves) were sold for," testified: "I came to Jacob Neff's, I think, in the year 1858. I stopped there. I shook hands with Aunt Betty Neff, and, says I: 'You are alone.' She said she was alone; that there was nobody there now but her and her brother Jacob Neff. And she says: 'I sold my black ones. They came to be very saucy and cruel.' And says she: 'I gave the money to George Neff. I hadn't any use for it myself.'" There is an attempt to weaken this evidence by the testimony of one of the counsel for the plaintiffs and the husband of one of the distributees, who say that at some former time Wolf stated to them that he had never heard Betty Neff say anything about this case, but that all he ever heard about it he got from George Neff. This testimony is very remote; and, if it discredits the fact testified to by Wolf at all, it does so merely by implication, and in a very limited degree.

Such are the facts and evidence in this cause, and, from the argument of counsel for the plaintiffs, I do not understand that they seriously controvert the fact that the proofs are sufficient to establish the will and purpose of Elizabeth Neff to give said slave money to George S. Neff, and that she had declared that purpose, and acted upon it by her failure to assert any claim to it for more than eight years; but they do claim, and earnestly insist, that there is a want of evidence to prove that there ever was any actual transfer or delivery, so as to make it a complete gift.

To show that the facts in this cause do not constitute a gift, the counsel cite and rely upon many cases, among them, the following: *Ewing* v. *Ewing*, 2 Leigh, 337; *Mahon* v. *Johnston*, 7 Leigh, 317; *Slaughter* v. *Tutt*, 12 Leigh, 147; *Miller* v. *Jeffress*, 4 Gratt. 472; *Martin* v. *Smith*, 25 W. Va. 579; *Dickeschied* v. *Bank*, 28 W. Va. 340. Several of these cases are concerning gifts *causa mortis*. While the rule as to the requisites of a gift is the same in such cases as it is in respect to gifts *inter vivos*, the evidence of the delivery is necessarily different. In the former case, the gift occurring *in extremis*, and taking effect only upon the death of the donor, the acts, acquiescence, and subsequent conduct of the donor can never be relied on as evidence of the delivery; but, in respect to gifts *inter vivos*, the subsequent conduct of the donor is often most potent evidence of the complete execution of the gift, which necessarily includes the transfer or delivery of it. But in gifts of either class there must, unquestionably, be a delivery.

It is the settled law both of this country and England that no parol gift, without actual delivery of the thing given, or some act of the donor which amounts to a complete transfer of the title and possession of the thing given, to the donee, can vest in the donee any right or title in or to it, or divest the right or title of the donor. This is the substance of the decisions cited and relied on by the appellees, and the correctness of the law as thus stated is not and can not be questioned. But the material matter here is not that there must be an actual delivery, but what is the character of the evidence necessary to prove the delivery, and whether or not the evidence in this cause is sufficient to prove that the fund in controversy was in fact ever delivered so as to divest the right and title of the donor, and vest the same in the donee.

In *McDonald* v. *Crockett*, 2 McCord, Eq. 130, it was held that "permitting personal property to go into possession of a daughter on her marriage, and to remain there a considerable time," raises a presumption of a gift. *Teague* v. *Griffin*, 2 Nott & McC. 93, 95; *Johnston* v. *Dillard*, 1 Bay, 232.

In *Hansbrough* v. *Thom*, Judge CABELL says: "Sales and gifts need not be positively proved. They may be inferred from circumstances." 3 Leigh, 155; *Hackney* v. *Vrooman*, 62 Barb. 650.

In *Tenbrook* v. *Brown*, 17 Ind. 410, the Court held as follows: "The delivery of a chattel is necessary to pass the title by gift, but the delivery must be according to the nature of the thing given; and if the property is, at the time of the gift, in the possession of the donee, as agent for the donor, it is not necessary that the donee shall surrender to the donor his actual possession; in order that the latter may redeliver the same to him, in execution of the gift; but if the donor relinquishes all dominion over the thing given, and recognizes the possession of the donee as being in his own right, and the latter accepts the gift, and retains the possession in virtue thereof, the gift is complete."

This decision is approved by the Court in *Wing* v. *Merchant*, 57 Me. 383, in which the facts were that the donor, several years before his death, left with his daughter, the donee, for safe-keeping, some notes payable to himself. About three years before his death the father gave these notes to his daughter. There was no assignment of the notes, or any writing transferring them. At the time of the gift the notes were in the daughter's possession, in a chest in her sleeping room; and nothing was done at the time of the gift, further than the declaration of the donor to the donee that he gave her the notes. In its opinion the Court says:

"No particular ceremony is necessary to constitute a delivery, when there is actual possession by the donee, accompanied by satisfactory evidence that the donor has relinquished all control of and claim to the subject of the gift in her favor. * * * The actual transfer of possession to the donee, whenever and however accomplished, if supplemented by plenary evidence of an intentional release to the donee on the part of the donor, *per verba de præsenti*, of any and all right or claim ever to resume the possession, or to deprive the donee of it, will make a complete gift *inter vivos*. It matters not whether the change of possession takes place before or after, or at the time of the utterance of the words importing the gift, if there is a manifest design on the part of the donor that the donee should thereafterwards hold such possession absolutely, as of his own property. Thenceforward the possession and the right are

concurrent in the same person, and the gift is perfect and irrevocable. *Gill* v. *Strozier*, 32 Ga. 688 ; *McCluney* v. *Lockhart*, 1 Bailey, 117."

The doctrine announced in these cases, when there are no suspicious circumstances impeaching the *bona fides* of the transaction, or evidence of fraud on the part of the donee, seems to me to be reasonable and just, and is approved. In the case at bar the conduct and declarations of Elizabeth Neff, supplemented by the facts and circumstances confirming them, are, it seems to me, ample to establish a complete gift of the fund in controversy to George S. Neff. In fact, the case made by the proofs is wholly irreconcilable with any other hypothesis or conclusion.

The circumstances and conduct of the donor here would seem to be of themselves sufficient to show a gift. In the early part of the year 1857 we find the money deposited in bank, to the credit of Tilden, and that same year it is assessed as the property of the donor. In the next year, 1858, no part of this money is assessed to her, but nearly the whole of it is assessed as the property of George S. Neff, the donee. The statute then in force required the assessor to call upon every person in his district to make out a list of the property and evidences of debt owned or claimed by him, and to swear such person to the accuracy of such list. Code, 1849, c. 35, §§ 58–61. The assessor is dead, and his deposition could not be taken ; but the law presumes that he did his duty. From this we must conclude that in the year 1857 the title to this fund passed from Elizabeth Neff to George S. Neff, and that it did so, not only with the knowledge, but with the active assent, of Elizabeth Neff ; for otherwise both she and George S. Neff would be chargeable with fraud and false swearing, and there is nothing in the record even tending to show that such was the fact.

In addition to this, the donor lived more than eight years thereafter, within two miles of the donee, and in almost daily communication with him. He used and disposed of this money as his own, with the knowledge of the donor. He never rendered any account to her, and she never demanded one. The friendly and intimate relations between them was not only not disturbed, but intensified by his care and

acts of kindness, and her appreciation and fondness for him. If we add to these and the other attending facts and circumstances hereinbefore detailed the repeated declarations of the donor that she had given the said fund to the donee, we have clear and convincing proof that there was an absolute and complete gift of said fund by her to her nephew.

For the foregoing reasons the decree of the Circuit Court must be reversed, and the exception of the administrator of George S. Neff to the report of Commissioner Sherrard, because it charges the estate of said Neff with the proceeds of the sale of the negroes, is sustained; and the cause is remanded to said court for further proceedings, in accordance with the principles announced in this opinion.

REVERSED. REMANDED.