# CHARLESTON.

CITY OF BENWOOD v. WHEELING RAILWAY CO.

Submitted February 11, 1903. Decided May 2, 1903.

53 465
o54 45

53 465
58 87

53 465
60 670

1. FRANCHISE—*Municipality—Notice.*

In granting a franchise or privilege, the council of a municipal corporation or a county court performs a legislative, and not a judicial, function, and the notice required by section 1 of chapter 29 of the 'Acts of the Legislature of 1901, is provided merely in aid, protection and extension of the right to be heard by petition, and need not set forth the day on which the application will be, or is expected to be acted upon. As the act requires the application to be filed thirty days before action upon it, and forbids any action upon it until after thirty days publication of notice, the notice is merely intended to apprise the public of its pendency. (p. 469).

2. ORDER OF PUBLICATION.

A statute requiring notice to be "given by publication for thirty days in some newspaper of general circulation" published in a county or city, is sufficiently complied with by publication in the successive issues of a weekly newspaper through the period of time named. (p. 471).

3. QUORUM—*City Council.*

Under a city charter requiring a quorum, composed of a majority of the members of the council, for the transaction of business, less than a quorum cannot convene a session of council and transact business. (p. 474).

4. CITY COUNCIL—*Vacancy—Illegal Members.*

Where, in such cases, less than a quorum meet, and attempt to declare the seat of an absent member vacant and elect another person to his seat, and still another to the seat of a member whose resignation has been placed in the hands of the mayor but not acted upon, before the other regular members appear, thus illegally giving themselves an apparent majority

in the council, the alleged election to fill vacancies are void, and the strangers so obtruded upon the council have no right to vote, and no measure can be passed by their votes. (p. 477).

5. MUNICIPAL CORPORATION—*Vacancy.*
    Although in a collateral proceding, parol evidence is not admissible to contradict the record of the proceedings of the council of a municpal corporation, it is admissible in such case, to show that the council had not, and could not have, convened at all, or acquired the right to make a record, when the alleged elections took place, although the minutes contain the recital, "Roll of members called and a quorum found present." (p. 476).

6. CITY COUNCIL—*Fraud.*
    Fraud both lurks and deals in generalities. (p. 477).

Appeal from Circuit Court, Marshall County.

Bill by the City of Benwood against the Wheeling Railway Company and another. Decree for plaintiff, and defendants appeal.

*Reversed.*

ERSKINE & ALLISON, for appellants.

CALDWELL & CALDWELL, for appellee.

POFFENBARGER, JUDGE:

Wheeling Railway Co. and Wheeling Traction Co. appeal from decrees of the circuit court of Marshall County, refusing to dissolve, and perpetuating, an injunction, awarded upon the application of the City of Benwood, restraining said companies from making certain connections of street railway tracks and trolley wires in the streets of said city, for the purpose of establishing a through line between the city of Wheeling and the city of Moundsville, which, instead of running through the main portion of Benwood, would pass along the border of the thickly settled portion of its territory.

Two principal questions are presented. One is whether an ordinance, granting the right to make the connections was passed by the common council of said city of Benwood on the 9th day of July, 1901, and the other, whether, if such ordinance was passed on that day, it was repealed on the 23rd day of July, 1901.

The validity of the action of the council, on July 9, 1901, whereby it is claimed, the privilege was granted, depends largely upon the construction of chapter 29 of the Acts of the Legislature of 1901, consisting of one section which reads as follows:

"No franchise shall hereafter be granted by the county court of any county, or other tribunal acting in lieu theerof, or by the council of any city, town or village incorporated under the laws of this State, where the application for such franchise has not been filed at least thirty days prior to the time when it is to be acted upon, but such county court or council, and notice of such application, stating the object of such franchise, shall have been given by publication for thirty days in some newspaper of general circulation published in such county or city wherein such franchise is to be granted. Nor shall such franchise be granted within thirty days after the application has been filed, nor until an opportunity has been given any citizen or corporation interested in the granting or refusing of said franchise to be heard. Nor shall any franchise hereafter be granted by any county court, or other tribunal acting in lieu thereof, or by any council of any city, town or village incorporated under the laws of this State, for a longer term than fifty years: *provided, however,* that nothing in this act shall prevent the renewal of any such franchise for a term of not exceeding fifty years when the same shall have expired. No franchise hereafter granted for any longer term than fifty years shall be of any force or validity."

Application for the franchise in question was filed May 28, 1901, more than thirty days before it was acted upon, and notice thereof was published from May 30, 1901, until June 27, 1901, inclusive, in a weekly newspaper, published in said city of Benwood. The objection is to the notice and the manner of its publication. It was not shown by the notice when the council would, or would be requested to, act upon it, and it is further objected that the publication should have been made in a daily newspaper.

By counsel for the appellees it is insisted the notice and the action of council in pursuance thereof are void, by reason of the failure to specify in the notice the time at which the application would be acted upon. It will be observed that such re-

quirement is not expressed in the act, and that the only express requirement as to its contents is that it shall state "the object of such franchise." To hold that such specification is essential, it must be found that it arises by implication. The only clauses from which such implication could arise are, "No franchise shall be hereafter granted by the county court of any county, or other tribunal acting in lieu thereof, or by the council of any city, town or village incorporated under the laws of this State, where the application for such franchise has not been filed at least thirty days prior to the time *when it is to be acted upon;*" and "Nor shall such franchise be granted within thirty days after the application has been filed, nor until an opportunity has been given any citizen or corporation interested in the granting or refusing of said franchise to be heard." With these, the direction as to the time and mode of filing the application must be considered. Mere inspection of the statute proves that it may be filed at any time with the "clerk of such court or council." Neither the clerk nor the applicant can fix the time of acting upon it. The applicant may say, in the notice that he will request action upon it at a certain regular meeting, but that would fall far short of showing "when it is to be acted upon," for he has no power to compel action at that time, nor to prevent action at an earlier date, should the tribunal before which it is pending see fit to make an earlier disposition of the matter. The only restraint imposed upon such tribunal is the inhibition of the statute that the franchise shall not be granted within thirty days of the time of the filing of the application, nor until thirty days notice shall have been given interested persons to be heard. The rule of implication in construction is that when a thing is commanded to be done, such command authorizes all that is necessary for the performance of what is ordered. Sedgewick Con. St. 228. In such cases, there is a necessary implication, which cannot be dispensed with. But this is probably only applicable where something, not expressed in statute, must be read into, in order to make it effective. There are, no doubt, instances in which, in the performance of a thing required by a statute, a choice of means is allowed, and, in that sense, powers not necessarily implied, arise merely by implication. The question raised here, however, is whether there is a necessary implication—whether the state-

ment of the time of action upon the application is so essential to the doing of the thing ordered, that it cannot be omitted. Its solution depends somewhat upon the nature and purpose of the notice and the proceeding to which it relates.

The granting of a franchise is a legislative, not a judicial, function. An application for such a franchise is, in no sense, nor to any extent, a proceeding *inter partes.* Nor is it an adversary proceeding. It is not adverse in a legal sense to the municipal corporation to whose authorities it is made, for they have absolute discretion to grant or refuse it, and from their decision, properly given, there is no appeal. In a sense, the granting of the franchise is a matter of grace, proceeding voluntarily from them, and not a right which anybody can obtain by compulsory process. As to the citizen, it is not adverse, for under the power of eminent domain his property may be rightfully taken or damaged, pursuant to the franchise, and his right is limited to the exaction of compensation, which does not arise upon the application for, or granting of, the franchise. By the Constitution, Article 11, section 5, this unrestrained power is vested in the council and left ungoverned by any direction as to the mode of its exercise. We now have for the first time, in the statute under consideration, a regulation of it by legislative act. That regulation does not expressly say the time of action shall be stated in the notice. If, in nature, the notice were judicial, and had been prescribed as a mode of exercising the fundamental requirement, in judicial proceedings, of citation, before hearing or condemnation, the time of hearing would be material and of the very essence of the notice. It would be read into the act as being necessarily implied. No man could be reasonably expected to be able to effectually make answer to a demand made upon him, without notification of the time and place of hearing. Here, no demand is made upon any individual. He is not called upon to answer or defend, but only to advise. The statute commands a hearing to be allowed, not only to those who are interested in the refusing of the franchise, but to those interested in the granting of it as well. Plainly, the interest referred to is merely the interest of persons and corporations as citizens. No other interest of theirs are subject to the powers of the council in such proceeding. Property rights of the citizen, resultantly and indirectly affec-

ted by it, come up for determination in other and subsequent
proceedings in other tribunals. What, then, is the object of
this notice? Clearly nothing more than an extension of the
right of the citizen to be heard by petition in respect to leg-
islation. The application shall be filed thirty days before ac-
tion upon it, and notice of its pendency shall be given by publi-
cation for the like period before action upon it. The
public are apprised by the notice of the pendency of
the application, and it is filed with the clerk so that
any person who cares to examine it may know where to find it.
In what manner he may express his approval or disapproval
is not indicated by the statute, and a choice of means is clearly
left open to him, but, obviously, he cannot interpose, in bar
of the proceeding, any right of his. This construction of the
statute clearly eliminates any imperative reason for holding
that the time of action upon the application shall be stated
in the notice. Hence, it cannot be said to be necessarily im-
plied. Having only authority to regulate the discretionary
power, vested in the council by the Constitution, and the reg-
ulation made being, in a sense, in derogation of the powers
so vested there is no reason why the courts should hold that
there was legislative intent to make the regulation broader
than the terms used in the statute, nor to divest the council
of its constitutional powers, except by express enactment.
"Notice," as used here, has not received any judicial construc-
tion which gives it the meaning contended for by counsel for
the appellee. A notice somewhat similar in character is required
by section 2 of chapter 44 of the Code, concerning the establish-
ment of ferries, and its language clearly imports that notice
of the presentation of the application is sufficient. The ob-
ject of the notice of the pendency of a legislative proceeding is
stated in *Smith* v. *Helmer,* 7 Barb. (N. Y.) 416, as follows:
"That notice was a direction to the public, calculated merely
to guard the Legislature from surprise and fraud, and to pre-
vent hasty and improvident legislation." In support of their
contention, counsel for appellees cite Elliott on Railroads, sec-
tion 1020; *Railroad Co.* v. *Frederick,* 46 Miss. 1; and *Morgan*
v. *Railroad Co.,* 36 Mich. 428, relating to the sufficiency of no-
tice in condemnation proceedings; and *Morgan* v. *Raymond
et als.,* 59 Mich. 548; 1 Mor. Cor. (2 ed.) 531; Cook Cor. &c.

section 595; and *Saud. Com. Co.* v. *Vassault,* 50 Cal. 534, concerning the requisites of notices of meetings of stockholders and municipal boards. These are so essentially different in nature, that the authorities really have no bearing upon the question involved here. For the same reason *Adams v.* *Clarksburg,* 23 W. Va. 209, and *Riley* v. *Oglebay,* 25 W. Va. 36, are also inapplicable.

Nor can the objection to the mode of publication of the notice be sustained. Publication in a weekly newspaper is a substantial compliance with the statute. A strict construction in this regard would lead to great inconvenience. Many counties and towns have no daily newspapers and no provision is made by the statute for want of such papers, and it mandatorily requires publication in a newspaper of general circulation published in the county or city wherein the franchise is to be granted. Counsel for the appellee claim *Kellogg* v. *Carrico,* 47 Mo. 157, sustains their contention, but it does not decide that publication in a weekly paper is insufficient. It only holds that the omission of Sundays in the publication of notice of a judicial sale, requiring publication for thirty days did not vitiate the notice. A similar statute, relating to publication of notice of sale under an order of sale in foreclosure proceedings was construed in *McCurdy* v. *Baker,* 11 Kan. 111. It required "public notice of the time and place of sale, for at least thirty days before the day of sale, by advertisement in some newspaper." The district court ruled that only one insertion, thirty days prior to the sale, was required, but the Supreme Court held that successive publications in issues of the paper, commencing more than thirty days before the sale, were required. It was made in a weekly newspaper and no question seems to have been raised on that ground. Had the Legislature intended the publication to be made daily it would no doubt have been more specific in the designation of the newspaper. It is required to be only a newspaper of general circulation. In construing statutes, requiring newspaper publications, this Court has heretofore applied the liberal, rather than the technical, rule. *Marling* v. *Robrecht,* 13 W. Va. 440; *Miller* v. *Neff.,* 33 W. Va. 197; *Sandusky* v. *Faris,* 49 W. Va. 150. No reason is found, either in the language of this statute, or in its nature, which requires more than a substantial compliance with its terms.

Publication "for thirty days in some newspaper of general circulation" is substantially fulfilled by publication in all the successive issues of a weekly paper for the required period of thirty days.

A third contention against the validity of the ordinance is that it was passed by a conspiracy on the part of the members of council in attendance July 9, 1901. That body consisted eight members. The meeting was a regular one and six of the eight members were present, while the mayor and recorder and two members are absent. Five of the six members present favored, and voted for, the ordinance, while the sixth one protested against the action on the application and refrained from voting. It does not appear that any representations or artifice was used to procure or induce the absence of the mayor, recorder and two councilmen. They say they understood there was to be no meeting, but fail to show that such understanding was had with any of the five members who favored the ordinance. Objection is made that one of the members unlocked the recorder's desk and took out the minute book and used it as recorder *pro tem* for the meeting. But for the grievance found in the passage of the ordinance, it is very unlikely anybody would ever have complained of his action. Absence of the mayor and recorder could not prevent the holding of a regular meeting, and the council, when in session, was entitled to the use of the official books and papers. Another charge of impropriety is that the recorder *pro tem* took the minute book to the office of the attorney for the railway company and entered in it the minutes of the meeting. As it is not claimed that the proceedings were entered otherwise than as they occurred, it is immaterial as to where the writing was done.

Was the ordinance repealed at the meeting held July 23, 1901? That was another regular meeting day of the council, and the minutes of the meeting read as follows:

"Benwood, July 23, 1901. Council met in regular session, Mayor Shepard presiding. Roll of members called and a quorum found present. The minutes of meeting of June 11, 1901, was read and adopted. On the following affidavit of Wm. Anderson the mayor declared Jacob Schramms' seat vacant which was read as follows and ordered put on the records:

State of West Virginia Marshall county, to wit, this day

personally appeared before me Henry Riddle a Justice of the Peace of Union District said county Wm. Anderson who being first duly sworn doth say, that Jacob Schramm one of the members of the common council of the city of Benwood in said county did 'on or about the 20th day of June 1901 move his property and family to the city of Bellaire, Ohio, with the intention of occupying of all of said property as soon as I could vacate the same. I gave him possession of said property to Jacob Schramm on the 28th June 1901 and to the best of my knowledge he has occupied the same ever since.

WM. ANDERSON.

Sworn to and subscribed to before me this 10th day of July 1901, in said county.

HENRY RIDDLE, a <i>Justice of Peace.</i>

On the filing of the above affidavit by a majority vote of council John Blake a resident of second ward was declared elected and sworn in by Mayor Shepard and took his seat as a member of council.

The resignation of Councilman Henry Slippner which is as follows

Benwood, West Va., July 23rd 1901.

*To the Honorable Mayor and council of city of Benwood*:

Gentlemen—I hereby tender my resignation as councilman of the city of Benwood.

Respectfuly yours,

HENRY SLIPPNER.

Motion by councilman Stewart of second ward, second by Gately of Third Ward that the resignation be accepted carried.

Wm. Hall of the 4th was nominated and elected to fill the vacancy. He being present was duly sworn in as councilman by Mayor Shepard.

The following ordinance was presented and was read first, second and third time under suspension of the rules and passed by its title by the following vote:

Gately, Kelly, Stewart, Blake, Hall voting aye.

Seabright, Miner, Whalen voting no.

An ordinance entitled an ordinance repealing all ordinances and resolutions which was passed by the rump council of the city of Benwood on July 9th, 1901 and striking from the records if any record appears of such action by said council.

Motion by Gately to adjourn carried by the following vote:

Stewart, Kelly, Hall, Blake, Gately voting aye. Those voting no—Miner, Seabright and Whalen.

F. W. POTTERFIELD, *Recorder.*"

The entry stating that a quorum was shown to be present on the roll call is clearly shown to be false. It is so admitted by the recorder and the mayor denies recollection as to who were present. The only members present were Stewart, Gately and Kelly. The mayor ruled, on the affidavit alone, that Schramm's seat was vacant, and, that as Schliptner had tendered his resignation, the number of councilmen were reduced to six, and he himself was *ex officio* a member, making seven of which membership the three members present and himself, making four, constituted a quorum. They elected Blake to take Schramm's seat and Hall to succeed Schliptner. All this was done very quickly and possibly before the hour of meeting had arrived, which was 8 o'clock P. M. Just as this work was concluded, the other four members, Schramm, Minor, Seabright and Whalen, came in, but Schramm was not allowed to vote. Minor swears they appeared between five minutes before and five minutes after 8 o'clock. In point of fact, Schramm had not moved his property and family to Bellaire, but had gone there to take charge of a bar-room for one Snyder. Bellaire lies across the river from Benwood and only a short distance therefrom. Schramm had taken over a couple of chairs and a bed, and staid there all the time, but his family and the principal part of his furniture remained in Benwood. Occasionally he came home at night and sometimes his wife and children went over and staid with him. He did not move until the latter part of October or the early part of November following. He personally went over to Bellaire and took charge of the saloon on May 28, 1901. Whether he intended to change his residence does not appear. He made an ineffectual effort to regain his seat by injunction, and on the 13th day of August, the council, under the impression that they were bound to do so by the temporary injunction, actually restored him to his seat in that body and put Blake out. At the same meeting they expelled Seabright on the ground of his having used offensive language about the mayor in the meeting of July 23rd.

There was no quorum nor any authority to do business, when

Blake was elected to membership. The council consisted of nine members, the eight councilmen and mayor, by express provision of the statute. The mayor had no right to declare Schramm's seat vacant on a mere *ex parte* affidavit, without notice or citation. Assuming that he could consider Schliptner's seat vacant on his resignation, which had never been tendered to the council nor acted upon, there were present only four out of the eight, and by express provision of the charter the mayor had no right to vote except in the case of a tie, from which it may be doubted whether he could be counted as a member making up a quorum, although the charter says the mayor and councilmen "together shall constitute a common council." However that may be, there was clearly no quorum present, and no session of the council had commenced when Blake and Hall were admitted to seats. They had no right to sit or vote in that meeting, and on the vote upon the ordinance to repeal the ordinance of July 9, 1901, the result was a tie, among those actually voting and entitled to do so, Gately Kelly and Stewart voting aye, and Seabright, Minor and Whalen voting no. Schramm attempted to act, demanded his seat and probably attempted to vote with the opposition but he was excluded. The mayor did not vote. Hence the measure did not receive a majority vote and so was not passed.

But can this be established by parol evidence in contradiction of the recital in the minutes, "a quorum found present?" "The minutes or records of the proceedings of municipal corporations, such as cities, districts, towns, school districts, boards of highway commissioners, and boards of county commissioners, cannot be contradicted by parol or extrinsic evidence in collateral proceedings." 20 Am. & Eng. Ency Law 510. It is so held by the courts almost universally. In *Shank* v. *Ravenswood*, 43 W. Va. 242, this Court holds that, "In the case of an inferior court, board or body, required to keep a record, the facts essential to give it jurisdiction must appear in its proceedings, else its action will be void and open to attack collaterally; but if its record state such facts, its jurisdiction will not be open to attack, nor can such facts be disproven in a collateral proceeding nor will any error appearing therein affect its action."

It is to be observed that this law relates to the record of the proceedings of such inferior tribunal, not to its organization,

or the commencement of its session. In *Shank* v. *Ravenswood,* the copies from the minutes of meetings of the council filed as exhibits show that the names of members attending the meetings were set out in the caption. This question did not arise in that case. If three out of eight members of a body may come together and declare themselves to be a quorum, by a mere assertion to that effect spread upon the minute book, and that cannot be contradicted by showing who were actually present, the matter becomes serious indeed. It is at variance with the universal practice of public bodies for all time. No court ever proceeds to transact business without showing the name of the presiding judge or judges. The first thing appearing upon every record of every court, board or other tribunal, is the name or names of the person or persons acting. A municipal board has no powers except such as are conferred by statute. It can transact no business without the presence of a quorum. That a quorum is present must appear upon its record as a fact, and not as a mere conclusion, or opinion, and the only way to make it appear as a fact is to set forth on the minutes the names of the persons in attendance. When that is done at the beginning of the session, the *status* so established is presumed to continue, unless the contrary appears in some way upon the record. The attendance of a quorum is a condition precedent to every thing. Until then there is an absolute incapacity to consider or act in any way upon any matter. When the body is legally convened and constituted, it has power to consider what is within its jurisdiction and authority, and to declare the existence of facts other than the fact of its own existence. Until it comes into existence, it cannot proceed nor make any record of its proceedings. It has no authority to make a record showing anything. Less than a quorum are without power to act or bind anybody in any manner. Their action, being absolutely void, may be ignored or attacked in any proceeding. The record of a legally constituted tribunal is aided and upheld by a presumption in favor of regularity. Surely there can be no presumption in favor of a record made by persons who have no shadow of authority to act. By making what purports to be a record, they cannot preclude an inquiry into their authority to make it, without so much as even disclosing who they are. To allow a mere gen-

eral statement of a conclusion to be put upon the minutes in lieu of an affirmative statement of such a jurisdictional fact, would be to ignore the maxim, *Fraus latet in generalibus* and *Dolus versatur in generalibus,* where their application is most necessary.

No such inquiry could be made in respect to a judgment or order of a court of superior jurisdiction. "Courts of *inferior* jurisdiction or limited powers must not only act within the scope of their jurisdiction, but it must appear on the face of their proceedings that they so acted; the record or minutes or papers in the case must affirmatively show the existence of every fact necessary to give jurisdiction in the particular cause; otherwise the judgment may be impeached collaterally, no presumptions are indulged in its support, and want of jurisdiction may be shown by evidence *aliunde.*" Black Judg. section 282. At section 287 of the same work, the doctrine announced by this Court in *Shank* v. *Ravenswood* is given, but it does not cover the question here presented, since it relates to proceedings assumed to have been had, in a tribunal the existence of which is not drawn in question.

*Mayer* v. *Adams,* 27 W. Va. 244, asserts a principle more in point here than any other found, for it indicates how jurisdictional facts shall be made to appear upon the record of a court of special and limited jurisdiction. There, the record of the county court, made at a special term, recited that it was a called session held "pursuant to notice as provided for by section 6 of chapter 5 of the Acts of 1881." JUDGE GREEN said: "What was necessary in such a case was to set out on the record the jurisdictional facts, in this case the notice, under which this special session was called, in its exact language and the fact, that it had been posted for more than two days prior to the meeting of the court by the clerk at the front door of the court house." The mere recital that notice had been given as required by the statute, referring to the section and chapter, was not sufficient, and it was held that the court had proceeded without jurisdiction. So here there can be no certainty as to the existence of a quorum without a recital of the names of those present. The absurdity of allowing a substitute in the form of a conclusion is made apparent and accentuated by the

flagrant transaction sought to be covered and hidden by it in this case.

These views result in the conclusion that the franchise claimed by the appellants, and from proceeding under which they have been enjoined, was granted and has not been repealed. Hence, the decree complained of should be reversed and the bill dismissed.

*Reversed.*

BRANNON, JUDGE, *(concurring)*:

I do not see that oral evidence can be received to contradict the statement of facts in the council record that a quorum was present. The first thing a council meeting must do is to ascertain whether a quorum is present. When it states the fact, it must be taken that its inquiry revealed that fact. That is a jurisdictional fact, I concede; but the fact is the ultimate fact, the result of the inquiry, and the record need not detail the facts going to show why it was found that a quorum was present. I think the proposition stated in *Shank* v. *Ravenswood,* 43 W. Va. p. 246, that the "facts necessary to be shown of record by an inferior tribunal are those facts only without which it had no power to act." "If the record shows that such facts were ascertained, it cannot be collaterally impeached." 12 Am. & Eng. Ency L. (1 ed.) 274 and n. 2.

I hesitate to unite in a rule of law opening council records to inquiry as to the constitution of all meetings where the record shows a quorum. It may bring much evil. By a direct proceeding for falsehood and fraud the record might be overthrown.

I prefer to concur on the ground that the grant was accepted and could not be repealed. 2 Smith, Munic. Corp. section 1708; *City* v. *Citizens,* 166 U. S. 568; *Town* v. *Railroad,* 51 W. Va. 183; *Mercantile* v. *Collins,* 101 Fed. 347; *N. O. Waterworks* v. *Rivers,* 115 U. S. 674. The only question about this point is whether the company had expended money on faith of the franchise before repeal. Is not the obligation assumed by acceptance to do railroad service a consideration to make a contract? At any rate, was not the repeal arbitrary, causeless action?