THIRD NAT. BANK OF CINCINNATI et al. v. JACKSON et al.

(Circuit Court, N. D. West Virginia.   August 10, 1907.)

No. 696.

1. CORPORATIONS—ACTION OF STOCKHOLDERS—VALIDITY.

The action of the stockholders of a corporation in authorizing the execution of a power of attorney to trustees to sell all of its property and collect and disburse the proceeds is not invalidated, because the majority of the stock, which was owned by a single person, was voted by him, although he had previously assigned it to the same persons who were trustees for the benefit of his creditors, with power to vote the same, where no transfer had been made on the books and some or all of the trustees were present at the meeting, and no objection to the action taken was made either by them or any stockholder, and where, moreover, all parties acquiesced in the carrying out of the proposed action.

2. ASSIGNMENTS FOR BENEFIT OF CREDITORS—CREATION—POWER OF EQUITY TO ADMINISTER.

A debtor entered into a trust agreement, pursuant to which he conveyed practically all of his property, which consisted of a large amount of stocks, bonds, and real estate or interests therein, to trustees for the benefit of his creditors, who assented thereto. A coal company, of which he owned nearly all the stock, also executed a power of attorney to the same trustees, authorizing them to sell its property for the same purpose. *Held,* that all such acts created a single trust estate, which a court of equity had power to take jurisdiction of and administer at the suit of creditors interested therein.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 4, Assignments for Benefit of Creditors, § 1.]

3. SAME—MANNER OF SALE OF TRUST PROPERTY—RIGHT OF TRUSTEES TO MAKE PRIVATE SALE.

Code W. Va. 1906, § 3053, which requires all sales under deeds of trust "to secure debts or indemnify sureties" to be made at public auction, and which superseded prior statutes giving the parties the right by contract to provide for private sales, if not directly applicable to general assignments for the benefit of creditors, is at least strong evidence that the policy of the law in that state is against private sales by trustees in the administration of such trust estates, and justifies a court of equity in refusing to authorize or approve such a sale over the objection of the debtor and interested creditors.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 4, Assignments for Benefit of Creditors, § 777.]

4. JUDICIAL SALES—REAL ESTATE—ASCERTAINMENT OF LIENS.

It is the established policy of the law in West Virginia that real estate will not be sold by a court until all liens and their priorities have been judicially ascertained and determined.

In Equity.

T. Moore Jackson, having assets consisting of bonds, town lots, and other real estate, stocks, notes, choses in action, and personal property aggregating, in estimated value, to about $1,183,000, and with liabilities, direct and indirect, amounting to about $1,035,000, on December 19, 1904, entered into a contract with his creditors, more than 85 per cent. of them joining therein, whereby he agreed to convey all his real estate and transfer all his personalty, except his home property in Clarksburg and the furniture therein, which was to be excepted and released, to Joseph E. Sands, Ira E. Robinson, and John W. Davis, trustees, with power to have full control of the properties, collect interest, rentals, dividends, and profits, to make sale, transfers, deeds, and conveyances, vote any and all shares of stock so conveyed in any meeting

of stockholders of the corporations in which said stock was so held, and to convert said real estate, real and personal, into money, and pay same to creditors. This agreement, carefully drawn, contains many other stipulations and matters of detail not necessary to refer to. In accordance with its requirements, said Jackson by deed of January 12, 1905, in which his wife joins, conveyed to said trustees all of his said real estate other than the excepted "Home Property," and on the same day he, in writing, assigned his personal property to said trustees, except that part excepted in the original trust agreement. The greater part of Jackson's assets and liabilities grew out of the fact that in 1893 the Ten Mile Coal & Coke Company, a corporation, with said Jackson and five others as stockholders, had acquired by purchase the coal underlying 33 tracts of land in Harrison county, aggregating 2,210.63 acres. Shortly after purchase, one of the stockholders died, and thereupon the surviving stockholders formed a partnership as T. M. Jackson & Co., and in the name of T. M. Jackson acquired about 1,600 acres more of coal and 184 acres of surface adjoining the first 2,210.63 acres. In 1901 this partnership was dissolved, all other members of it conveying their interests to Jackson for $101,360.84, evidenced by 104 notes given by him, due to said several partners January 1, 1907, and to secure which a deed of trust was executed by him on the property bearing even date, November 30, 1901, with the conveyances by said partners of their interests to him and of the Ten Mile Coal & Coke Company of the 2,210.63 acres standing in its name, which last conveyance was in consideration of $114,800.74 evidenced by 118 notes given by Jackson, due January 1, 1907, and secured by vendor's lien on the face of the deed. Jackson also assumed payment of the balance of purchase money due the farmers from whom the coal was originally bought secured in their deeds by vendor's liens. On December 17, 1903, Jackson formed the Dola Coal & Coke Company Corporation, and on the 28th he conveyed this coal field to it. Its capital stock issued was $600,000 of which Jackson took $500,000 and the other $100,000 was issued to other parties. On January 1, 1904, this Dola Coal & Coke Company executed to the Security Company of Wheeling, as trustee, a trust mortgage to secure bonds to the amount of $500,000. Of these bonds Jackson became the owner of $415,000; the other $85,000 being held by a Pittsburg bank. Jackson hypothecated his bonds or a greater part thereof to secure debts to various creditors of his, and on January 23, 1905, the Dola Coal & Coke Company by contract in writing constituted said trustees of Jackson said Sands, Robinson, and Davis, attorneys in fact to sell all said coal field with its mining rights and privileges, with power to enter into contracts, options, or negotiations, to execute all necessary conveyances, collect all proceeds of sale, and disburse proceeds to parties interested. The trustees under this power energetically sought to sell said coal field, first holding it at a price of $250 per acre, then reducing to $200 per acre, and finally, on September 17, 1906, they by circular letter to the creditors, informed them that they (said trustees) had received an offer of $145 per acre, $20,000 to be paid in cash, $80,000 upon date of execution of deed and the residue in $100,000 annual installments, and that unless a better offer was received on or before September 27, 1906, or they should receive before that date a united request from the holders of the bonds for a public sale of the property, accompanied by assurances that the bidding thereat should be started at not less than the par value of the bonds, they would on that date accept said offer. These conditions not being complied with, they did enter into the contract of sale referred to with C. E. Conaway, who it subsequently appears was acting for J. V. Thompson. Thereupon the plaintiffs herein presented their bill to a judge of this court, in which they set forth the facts substantially as given above, allege themselves to be unsecured creditors of Jackson, holding none of the bonds of the coal company, yet vitally interested in the sale of its property at a fair price, because, from the surplus of the proceeds of such sale after payment of debts secured by the hypothecation of such bonds, they must look almost wholly for the payment of their debts; that at the price of $145 per acre little or nothing will accrue as such surplus, because $141.31 per acre would be required to pay the secured debts by reason of such hypothecation of bonds, and the "farmer" and "partners" liens upon the property; that said price is grossly inadequate as shown by the statement

of the said trustees themselves in their circular letter to creditors; that a sale of such property ought not to be made until the liens and the holders thereof with the true amounts due each had been ascertained and fixed; that adjoining coal property of no better value had recently been sold at $300 per acre, and that, if the property was sold under the protection and direction of this court at public auction, it would bring not less than $200 per acre. The prayer of the bill is for an immediate restraining order against said trustees staying them from consummating said sale; for a full report and settlement of the transactions of said trustees; for full discovery from the trustee in the bond mortgage as to the holders of such bonds and of the stock of said company and the holders thereof with the considerations of such holdings, that a reference be made to a commissioner to ascertain and report all liens and incumbrances, and that a sale of the property at public auction by the trustees be required. The temporary order prayed for was granted on October 29, 1906, and set for hearing on the 1st day of the January, 1907, term at Parkersburg. Prior to that date, on December 15, 1906, the defendant trustees, having given notice, entered a motion to dissolve the restraining order, for a rule for security for costs, and a motion to require plaintiffs to give an injunction bond. The plaintiffs asked leave by petition to file an amended and supplemental bill. The court allowed the filing of this bill, allowed Charles E. Conaway and said trustees at their request until January 8, 1907, to file answers thereto, required plaintiffs by said date to give bond for security for costs, and took the motions to require injunction bond and to dissolve the restraining order under advisement, and on its motion allowed the Braddock Machine and Manufacturing Company, a creditor, to intervene and become a coplaintiff. On January 14, 1907, in term, plaintiffs were allowed to amend bills by making the Dola Coal & Coke Company party, replications were filed by them to the answers of C. E. Conaway and of said trustees to the original and supplemental bills which had been filed, numerous affidavits in support of the motion to dissolve the restraining order and in opposition to such motion were filed, and a motion to appoint a receiver as prayed for by the supplemental bill was entered and the answer of T. Moore Jackson was filed. On January 15, 1907, additional affidavits were filed, the motions to dissolve the restraining order, to require injunction bond, entered by defendants, for an injunction, the removal of trustees, and the appointment of a receiver, entered by plaintiff were argued and submitted.

V. B. Archer, for plaintiffs.
G. C. Lewis, for Braddock Machine & Mfg. Co.
John Bassel and E. B. Templeman, for trustees.
Sperry & Sperry, for Jackson.
Johnson & Hoffheimer, for Hornor.
W. S. Meredith, for Conaway.

DAYTON, District Judge (after stating the facts as above). In the consideration of these pending motions, I have felt constrained to eliminate many matters presented by the amended bill. I do not for a moment undertake to determine the question of whether the defendant Jackson may or may not have a good cause of action against the Baltimore & Ohio Railroad Company for the alleged discriminations made against him or the Dola Coal & Coke Company which he substantially owned and controlled, nor do I attempt to determine whether he has such action against Rogers and said railroad company for violation of Rogers' agreement and contract with him by virtue of the sale of the Short Line Railroad to the said Baltimore & Ohio Railroad Company by Rogers with alleged knowledge at the time of purchase on the part of the Baltimore & Ohio Company of such contract. Nor do I attempt to determine whether a conspiracy, as charged, existed

between the Baltimore & Ohio Company and the Fairmont Coal Company or their officers to depreciate the value of the Dola Coal & Coke Company coal field, prevent its purchase by independent operators, and secure it for the Fairmont Coal Company at a minimum price.

I do not consider these matters as in this case requiring independent action on this court's behalf because neither Rogers, the Baltimore & Ohio Railroad Company, nor the Fairmont Coal Company are parties, and in consequence are not and cannot be bound by the allegations of the bill, and in their absence as such no proper investigation could be made by this court to ascertain whether reasonable ground existed for directing suit to be brought by the trustees, or a receiver appointed, at the expense of the trust funds to recover damages for such alleged wrongs; but there is a stronger reason than this in my mind why I must disregard these matters, and that is I do not regard the terms of the trust agreement, trust conveyances, and power of attorney executed by Jackson and the Dola Coal & Coke Company to these trustees as broad enough to include the right either to institute or to expend the trust funds in prosecution of such actions, but, on the contrary, I regard the rights of both Jackson personally and of the Dola Coal & Coke Company to be wholly reserved and unimpaired to them to institute and prosecute in their own names suits upon such causes of action, if such there be. These allegations of the amended bill could only be considered as tending to show that this court should exercise that discretion which it has under equitable rules to set aside the sale made by the trustees, and, these allegations by the answers and affidavits filed being all denied, I am constrained substantially to ignore them. Nor do I regard the charges of misconduct on the part of these trustees as sustained. It seems to me that, under all the circumstances, they are subject to neither condemnation nor just criticism. It is to be remembered that they undertook what has been almost universally found to be an impossibility, to wit, to administer and settle a very large trust estate composed of much realty, and various kinds of personalty, without the aid of a court of equity, to the satisfaction of three naturally antagonistic classes—preferred creditors, unsecured creditors, and the debtor himself. Nothing was more natural on the part of the first than impatience at all delays, and a sense that having the first right to the proceeds of sale they ought to have that sale speedily consummated. The unsecured creditors on their part might well demand that delay to prevent sacrifice was absolutely a right and necessity. This latter plea could also be asserted by the debtor above all others. In this case Jackson is clearly shown to be an accomplished civil and mining engineer—a man accustomed to large business transactions, who, with scientific knowledge, had examined the coals underlying a large section of country, and had selected and purchased this Dola field as being the very best and most valuable to be found. He found that he had overreached himself by reason, as he firmly believed, of the bad faith towards him on the part of Rogers and the railroad company. Whether this was true or not, he was convinced of the value of this field, and, if sold for what he deemed its value, he felt confident the proceeds would pay his debts. Most naturally he could not contemplate with equanimity sales of his property indicat-

ing that near a half million dollars of debts due to those who had trusted him should go unpaid, and, notwithstanding he was released by the contract from the payment of these debts, no one can justly criticise him for earnestly desiring their payment and doubting the wisdom of the policy by which any other result would transpire.

Under such irreconcilable conditions I am constrained to believe these trustees have done the very best they could to solve the problem, and have come as near doing so as any one ever has under like circumstances.

To one other matter in this cause I attach little or no importance, namely, the objection made to the authorization of the power of attorney to these trustees by the stockholders of the Dola Company. It is insisted that the minutes of this company show that Jackson's stock was represented and voted by himself when he had, at the time, assigned this stock to these trustees who alone in consequence could vote it, and therefore this power is void. I do not regard this contention as sound for these reasons: First, the stock had not been transferred to these trustees from Jackson on the books of the company, and was therefore properly voted in his name; second, it appears that both he and one or more of these trustees were present at the stockholders' meeting when this action was taken. It was taken with no record protest on the part of any, and it must be conclusively presumed that it was taken by concerted action of both Jackson and said trustees, and, finally, these trustees assumed to act under this power, and they are estopped from denying the regularity of said power; so, too, are Jackson and the company, because both have acquiesced in such action by said trustees.

The whole matter, therefore, narrows itself down to this question: Shall this court of equity intervene at the instance of creditors, take control of this property, set aside the private sale made by the trustees, and direct them to make public sale of this coal field under such terms and conditions as it may determine upon? After long and patient study of this question, I have reached the conclusion that such intervention by this court cannot be avoided. I reach this conclusion for these reasons: First. It is well settled that it is immaterial as to the form and character of the instrument by which a trust may be created. It may also be created by more than one instrument in different forms, each bearing different technical names. The question in equity is always one of substance, and not of form. I therefore construe the original agreement between Jackson and these trustees, the deed for his realty, the memorandum of assignment of his personal property and the power of attorney of the Dola Company to them, as means resorted to, to accomplish a single purpose, the creation of a trust in these trustees for the benefit of his creditors. The power of attorney, it is true, goes a step beyond the other writings, and gives the right of disposition of the coal property of the Dola Company in which Jackson was not alone interested. However, it cannot be denied that his interest was almost the whole thereof, that this power was executed solely because of his transfers before made, and with the sole purpose of better obtaining and securing his interests therein and vesting the

same in the trustees. It must, therefore, in my judgment, be considered as a part of the whole trust and administered as such. This being so, it is not to be forgotten that equity has always exercised the most complete and exclusive jurisdiction over such trust estates, and, further, that it is and has been the uniform policy of equity, except in very rare instances under very exceptional cases, to require sales of realty especially so conveyed in trust to be sold at public outcry. It is well settled that even an agreement on the part of a person interested in such trust estate not to institute suit in equity in aid of its administration is contrary to public policy, and cannot be enforced. It is the inherent right of every one to appeal to the courts for the ascertainment and settlement of his legal rights, and no other form can be established, by contract or otherwise, to destroy this right of appeal thereto. The general policy of courts of equity to require sales of realty under trusts made for benefit of creditors to be at public auction, is also very clear. It is to be remembered that the modern deed of trust is simply the child of the mortgage; that its raison d'être was the complaint that the mortgage proper could only be made effective by a resort to a suit in equity wherein the title to the land conveyed could be quieted in the mortgagee and all equity of redemption in the mortgagor cut off, or by a public sale of the property itself or of this equity of redemption, the former being the usual practice in England, the latter in Ireland and Virginia. The expense and delay involved in these equitable proceedings, especially in the early days of Virginia where the court circuits covered large territory, the terms were not numerous, and above all, where the values were not great, very naturally turned the legal mind to devising some means by which the same results could be obtained without the delay and expense. Hence it was natural that the deed of trust should rapidly become popular as a substitute for the mortgage. Its integrity rested at first, and, to a measure at least, still rests, upon the right of contract between debtor and creditor by which they could agree upon the terms whereby the property of the one could be sold and the proceeds paid to the other by an intermediary acting as agent for both. At first these deeds of trust were not governed by statute, and the first act of the Virginia Legislature in relation thereto appears in chapter 117 of the Code of 1849. Section 6 of this chapter provides that in all such trust deeds designed "to secure debts or indemnify sureties," as follows:

"Sec. 6. The trustee in any such deed, *except so far as may be therein otherwise provided*, shall, whenever required by any creditor secured, or any surety indemnified by the deed, * * * after the debt due to such creditor or for which such surety may be liable, shall become payable, and default shall have been made in the payment thereof, * * * sell the property conveyed by the deed * * * at public auction," etc.

The provision of the Virginia Code of 1860, in chapter 117, § 6, in this particular is the same, as also our Code (W. Va.) 1868, c. 72, § 6, and the amended act passed February 28, 1870 (Acts 1870, p. 65, c. 51). Under these legislative provisions public sales under this class of trusts, while favored, were allowed to be subject to the contract of the parties contained in the deed, as shown by the italicized part of the quota-

tion. By the act of March 25, 1882 (Acts 1882, p. 440, c. 140), this provision was changed and amended so as to read:

"Sec. 6. The trustee in any such deed shall, whenever required by any creditor secured, or any surety indemnified by the deed, * * * after the debt due to such creditor or for which such surety may be liable, shall have become payable, and default shall have been made in the payment thereof * * * sell the property * * * at public auction upon the following terms * * * unless a different provision as to the terms of sale has been inserted in the deed."

By Act Feb. 25, 1887 (Acts 1887, p. 177, c. 54), this section was further amended as follows:

"The trustee in any such deed, whenever required by any creditor secured, or any surety indemnified by the deed, * * * after the debt due to such creditor or for which such surety may be liable, shall have become payable, and default shall have been made in the payment thereof by the grantor, sell the property conveyed by the deed or so much thereof as may be necessary, at public auctions upon such terms as are mentioned in said deed; and if no terms are therein mentioned, then upon the following terms," etc.

And very specific provisions are then made for the advertisement of such sale. This section was again amended by the act of March 7, 1891 (Acts 1891, p. 199, c. 77), contained in our Code (W. Va. 1906) as section 3053, but the provision above quoted remains the same.

It will be noticed that in a deed of trust "to secure a debt or indemnify a surety" the statute requiring a sale at public auction has become absolutely mandatory, regardless of the provisions of the deed itself. This change has not been made through these series of amendments, I conceive, undesignedly, and it illustrates very forcibly the proposition that the policy of the law is against private sales of trust properties. But it is argued very ably by counsel for these trustees that there is a distinct difference between deeds of trust "to secure a debt or to indemnify a surety" and general assignments to such trustees for the benefit of creditors; that, in the first class of cases, an equity of redemption remains in the debtor, while the latter is an absolute sale of all the debtor's rights and interests which immediately vest in the trustees. It is therefore insisted that this section 6 (or section 3053 of the Code) does not apply to the latter class of instruments.

The first proposition I concede without a moment's hesitation. It is clearly set forth in Sandusky v. Faris, 49 W. Va. 150, 38 S. E. 563, and the authorities therein cited. As to the second, that this section 6 does not apply to such general assignments, I have grave doubt. In fact, I am inclined to the belief that it does for this reason: That, in the latter amendments made to it, full provisions are made for the advertisement of the sale, for its expenses, the payments of the debts secured, the disposition of the surplus, for bond to be given by trustee when required, what facts the advertisement of sale shall state; and then adds:

"And in all cases where a debtor conveys all his property to a trustee for the benefit of his creditors, or where he conveys all his property except what is exempt from execution or other process, every such trustee shall settle his accounts before a commissioner of accounts of the county in which such bond is recorded, and the provisions of chapter 87 of the Code of West Virginia as amended, shall apply to such settlement as far as applicable."

It is very difficult to conceive why this provision should be incorporated in this section if it were to be construed as wholly irrelevant to the section's general scope and purpose. On the other hand, it may be well reasoned that this distinction between a deed of trust to secure creditors and sureties, and a general assignment for the benefit of creditors, being practically one without a difference—the right of the debtor to pay off his debts and redeem his property under the latter being admitted—no reason can be advanced why it should be held to exclude general assignments from the safeguards provided by this section, but, on the contrary, that in such assignments, especially upon demand of the creditors who have little hope of securing payment of their debts otherwise than by it, its provisions should be especially applicable and enforced. I am fully aware that the Supreme Court of Appeals of this state has held in such cases as Harden v. Wagner, 22 W. Va. 356, Kyle v. Harveys, 25 W. Va. 716, 52 Am. Rep. 235, Landeman v. Wilson, 29 W. Va. 702, 2 S. E. 203, and Cohn v. Ward, 32 W. Va. 34, 9 S. E. 41, that provisions in deeds of trust providing for private sales by trustees do not render such trust deeds void on their face. Most of these cases relate to trust conveyances of perishable personal property, such as stocks of goods and merchandise, although in the two latter cases the ruling is extended to such provisions as to both real and personal property. The exact question does not arise in those cases. It may very well be held that such provisions may not render the security of the creditors void, but the very fact that it has been held in Kyle v. Harveys, supra, that:

"If, when the assignor provided in his assignment that the stock of goods should be sold at private sale, he did so with the bona fide purpose of realizing for his creditor the largest amount possible, then this assignment is not fraudulent and void as against his creditors. But if the provision that these goods should be sold at private sale was inserted by the assignor, believing at the time that the interests of his creditors would thereby be prejudiced and with a view only of furnishing remunerative employment to himself or to the assignee, and the assignee knew this when he took possession of the stock of goods, then the assignment is fraudulent, and will be void as against all the creditors of the assignor"

—would seem to strengthen the proposition I am contending for, that the whole policy of the law is against private sales by trustees in the administration of these trust estates. And I am driven to the conclusion that it would be under most extraordinary circumstances, if ever, such trustees would be allowed to so sell such trust estate, especially realty of great value, against the express protest of both debtor and interested creditors. The very reason for this is apparent, in that the man seeking to buy may just as well do so at public as private sale. I have not been able to find a single case in this state where such sale at public auction has been refused and the private sale of the trustee confirmed, and the very absence of such decision is significant if not decisive. It may be said that Barnett v. Higgins, 2 W. Va. 485, contradicts this statement, but, unsatisfactory as the opinion there is, it is apparent that the trustee made private sale only after offering at public outcry and then for advanced price. The cases cited by counsel of Braford v. McConihay, 15 W. Va. 732, Lallance

v. Fisher, 29 W. Va. 512, 2 S. E. 775, and Jones v. Neale, 2 Pat. & H. 339, where sales of trustees were not set aside for inadequacy of price all relate to public and not private sales.

Second. I am led to believe that this bill must be sustained and this property be required to be sold under the supervision of this court upon demand of these creditors, because it is the well-established policy of the law in this state to sell real estate only after the liens and their priorities have been ascertained and settled. Section 4147 of our Code (W. Va. 1906) expressly requires such liens to be ascertained, notice to lienholders to be published, and that all rights to parties to except and contest shall be preserved. It is needless to cite the multitude of cases construing this statute. I have not the slightest doubt of the sincerity of these trustees in their statement that they have accurately, as they believe, ascertained the creditors, their debts and priorities, secured by this deed of trust. We must admit, however, that this is private judgment, and not judicial determination. It was expressly provided in the trust agreement that creditors should have the right to sue to establish their debts and liens, and, if it had not been so provided, I think this right clear and undisputable if exercised within proper time. And, finally, while no man can tell whether this large and valuable property, if sold at public auction, will or will not realize a larger sum than the one offered at this private sale, it is nevertheless true that many think it will, that a considerable larger sum has been offered for it whether by one who could fulfill his offer or not we cannot tell, and that these trustees themselves expressly state in their circular letter to creditors that the sale price of $145 per acre is much below the true value of the property. Under such conditions, it seems to me I must set aside this private sale, entertain this bill, ascertain the liens and charges against this real estate, and direct the sale thereof to be made by these trustees under the direction and orders of this court.

It follows, therefore, that I overrule the motion to dissolve the restraining order, although its purpose has been accomplished, also the motion for injunction and for a receiver, for I do not regard either as necessary, and I further overrule the motion to require injunction bond, the plaintiff having already given security for costs in the sum of $1,000, which I regard as amply sufficient.